[Crim. No. 8470. Second Dist., Div. One. Jan. 29, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID O.
LINDOGAN, Defendant and Appellant.

Max Solomon and John J. Bradley for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Mario A. Roberti, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—The trial court found defendant guilty of three counts of bookmaking in violation of subdivisions 1, 2 and 4, section 337a, Penal Code. He appeals from the judgment of conviction and order denying motion for new trial.

The issue relates to probable cause. The evidence viewed in a light most favorable to respondent discloses the following: After receiving information from Officer Maga of the Los Angeles Police Department that bookmaking had been going on at 1557 Rockwood Street, an arrest had been made there a year before and "they" were back in business and working again, and bookmaking was now being conducted at that location by a crippled male Philippino named "David," who previously had been arrested there. Officers Kamidoi, Wyatt and two other officers went to the address to conduct a bookmaking investigation and talk to "David." Located there was a large private home owned by a Mr. Lavilla, who, when asked by the officers if they could "look around," answered, "Go ahead." They then talked to his wife, the landlady, and advised her that they were checking the location to determine whether bookmaking was being conducted there, and "got her permission to search the house." Kamidoi asked if a "David" lived there; she said, yes, he was her only roomer. When asked, "May we speak to him," she opened the door, pointed down the hall and said: "This is his room here. . . . If he is not in this room there is a place downstairs he goes to sometimes." The officers opened the door but saw no one in the room; they did not then search it. The officers and Mrs. Lavilla went to the basement; they saw a locked door and asked about it; she said her tenant occupied the room. Wyatt knocked and identified himself as a police officer; there was no response. He remained at the door for about two minutes, then started to walk away; as he did so he heard the telephone ring from behind the door and a muffled conversation. Wyatt knocked again, in a loud voice identified himself as a police officer, and told whoever was inside to open the door. Several minutes passed but there was no response; however, when he smelled an odor resembling burning paper coming from the room he forced the door open and entered. Defendant was lying in bed with a telephone in one hand and a pencil in the other; the officers saw racing sections from several different Los Angeles newspapers, the National Daily Reporter, (Ex. 2), several betting markers, (Ex. 1), and a burned piece of paper in the wastebasket. (It was stipulated that Kamidoi was qualified as an expert in bookmaking activities; that Exhibits 1 were betting markers written by defendant containing num-

bers of horses running at some track in the United States on the day of his arrest, and the amounts wagered were to win, place and show; and that Exhibit 2, a National Daily Reporter for that day, was commonly known as a national scratch sheet.) During the half hour they were in defendant's room the telephone rang seven or eight times and the officers answered it. A male voice said 'this is Illagio'' and asked to speak to David; he said he wanted one across on Distructor in the eighth, and two to win on Sir Jake in the eighth, and asked if this would be all right; the officer said, ''Yes,'' and the voice responded, ''That's $5, right?'' On another call a voice said, ''This is Illagio again. I want to get down on Finnigan in the seventh, to Sir Jake in the eighth, two to win and two to place parlay.'' Both in his room at the time of his arrest, and at the police station defendant said he was ''taking bets,'' he had been a cripple for 16 years, couldn't do anything else and had nothing else to live for.

Appellant claims that the arrest and search of the premises were not based upon probable cause, thus the evidence was improperly admitted. He argues that ''one officer cannot furnish reasonable cause for arrest to a second officer'' where the former did not appear as a witness; and that ''Officer Wyatt obtained no knowledge of appellant's arrest prior to breaking down the door.''

There exists no formula for ''reasonable cause'' (*People* v. *Fisher,* 184 Cal.App.2d 308 [7 Cal.Rptr. 461]) and a determination whether it exists in a given case depends upon the factual situation presented or apparent to the officers at the time they were required to act (*People* v. *Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799, 43 Am.St.Rep. 73]); the weight to be accorded the information or knowledge in possession of the officers at that time is for the trial court. (*People* v. *Fisher,* 184 Cal.App.2d 308 [7 Cal.Rptr. 461]; *People* v. *Boyles,* 45 Cal.2d 652 [290 P.2d 535]; *People* v. *Carella,* 191 Cal.App.2d 115 [12 Cal.Rptr. 446].) ''Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.'' (*People* v. *Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Fischer,* 49 Cal.2d 442 [317 P.2d 967]; *Bompensiero* v. *Superior Court,* 44 Cal.2d 178 [281 P.2d 250]; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799].)

Just before forcing the door and entering the room,

pointed out to them by the landlady as being occupied by defendant, the officers, experts in bookmaking activities, had in mind a factual situation consisting of information from a police officer that bookmaking had previously been conducted at defendant's residence and was now being conducted there by "David" and that he had been arrested before in the same location; knowledge obtained from defendant's landlady that a man named "David" was her only roomer and he occupied the room in question; and certain personal observations—the door to the room was locked, therein a telephone was being used, someone was in the room who, when ordered by them to open the door, refused to do so or respond, and immediately thereafter an odor resembling burning paper came from the room.

Information obtained through official channels has by its very nature been determined to be sufficiently trustworthy to justify reliance thereon in making an arrest. (*People* v. *Stewart,* 189 Cal.App.2d 176 [10 Cal.Rptr. 879] ; *People* v. *Lopez,* 196 Cal.App.2d 651 [16 Cal.Rptr. 728].) However, in the *Stewart* case, *supra,* the information obtained by the arresting officer from the police department related to an outstanding traffic warrant on file therein; in the *Lopez* case, *supra,* information that defendant was wanted on a charge of stealing and forging checks was obtained by the officer from an agent of the U. S. Treasury Department. ■ In the instant case evidence was sufficient to sustain an implied finding that the information obtained from Officer Maga was reliable insofar as it related to the fact of defendant's previous arrest at his residence, for its trustworthiness obviously depended upon official law enforcement records. But a different situation arises relative to the information received from Maga that bookmaking activities were now being conducted at that location by a man named "David." While it is true that hearsay evidence is admissible on the issue of reasonable cause (*People* v. *Fischer,* 49 Cal.2d 442 [317 P.2d 967]), and sometimes even hearsay based upon hearsay, as in *People* v. *Carella,* 191 Cal. App.2d 115 [12 Cal.Rptr. 446], the state of the evidence in the case at bar is such that it cannot be determined upon what this information was based, who the "someone" was who supplied it to Maga, or whether he was reliable.

However, for the moment leaving this issue undetermined and disregarding the information in question, the officers had knowledge of other facts obtained from the landlady and through their own observations, sufficient to lead them to be-

lieve that a felony was being committed behind the locked door by a male named "David." Besides being informed from an official source that a "David" had before been arrested at that location, the landlady told the officers that a "David" was her only roomer and was presently occupying the room in question. The officers found the door locked but that someone, whom they suspected to be "David," was inside, and that "David," knowing them to be police officers, refused to respond; they heard activity behind the locked door and someone use the telephone, the main item of paraphernalia of a bookmaker, and knew that during this time "David" again refused to respond to the officer's order to open the door; and they immediately thereafter detected the odor of burning paper, the method commonly used by a bookmaker to dispose of betting markers or like evidence. ██ Experienced in the area of bookmaking activities and knowing "David" had been previously arrested at this location, and having observed his behavior upon his being advised that the police wanted to see him, the officers were then justified in relying on the information given to them by Officer Maga that bookmaking was being conducted at that address. (*Willson* v. *Superior Court,* 46 Cal.2d 291 [294 P.2d 36].)

██ We conclude that the evidence before the court was sufficient to justify the conclusion that a violation of section 337a, subdivision 2 was being committed in the room, that the officers had reasonable cause before entering to believe that defendant was so engaged, and thus the arrest was lawful.

██ Having reasonable cause to arrest defendant, the officers had a right to enter the room; and in view of his repeated refusal to open the door to police and their strong belief he was then engaging in bookmaking and attempting to burn evidence of his illegal activities, they also properly gained entry by forcing the door. (*People* v. *Maddox,* 46 Cal.2d 301 [294 P.2d 6].) ██ While incident to a lawful arrest the officers have a right, without a warrant and in good faith, to make a reasonable search of the premises and seize evidence related to the crime (*People* v. *Winston,* 46 Cal.2d 151 [293 P.2d 40]; *In re Dixon,* 41 Cal.2d 756 [264 P.2d 513]), no real search was here involved. (*People* v. *Quinn,* 194 Cal.App.2d 172 [14 Cal.Rptr. 814].) The articles taken and subsequently received in evidence—various betting markers (Ex. 1) and the National Daily Reporter (Ex. 2)— were in plain sight of the officers as they entered the room.

It was unnecessary for them to, and the officers did not, search the premises to find them. ██ "To observe that which is open and patent is not a search." (*People* v. *Jaurequi,* 142 Cal.App.2d 555 [ 298 P.2d 896] ; *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721].)

While it is obvious from the testimony of both Mr. and Mrs. Lavilla that they gave their consent to "look around" and "search the premises," in view of the foregoing, we deem it unnecessary to discuss the matter of consent to the search.

The purported appeal from the order denying motion for new trial is dismissed (*People* v. *Eppers,* 205 Cal.App.2d 727 [23 Cal.Rptr. 222]) and the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.