[Crim. No. 10942.   Second Dist., Div. Two.   Aug. 8, 1966.]

THE PEOPLE, Plaintiff and Appellant, v. DANIEL PATRICK CARR, Defendant and Respondent.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood, Chief Deputy District Attorney, and Wilber A. Sweeters, Deputy District Attorney, for Plaintiff and Appellant.

Daniel J. Jaffe for Defendant and Respondent.

ROTH, P. J.—Following a preliminary hearing in the municipal court, respondent was charged by information with attempted burglary, Penal Code sections 459 and 664, (count I) ; burglary, Penal Code section 459, (counts II and III) ; and receiving stolen property, Penal Code section 496, (count IV).

Respondent moved under Penal Code section 995 to discharge the information on the ground that the evidence against him was obtained pursuant to an illegal search and seizure. The motion was granted as to counts II, III and IV of the information. The People appeal.

Respondent was arrested in Burbank, California, in the act of breaking down the rear door of a furniture store with his automobile. An automobile matching the description of respondent's car had been previously spotted at the scene of several other furniture store burglaries in the Burbank area.

George Carsten, a Burbank police detective, who investigated the case, testified at the preliminary hearing to a conversation he had with respondent in the Burbank jail and to subsequent events, as follows:

"I asked the defendant if he lived alone, and he said yes, and then he stated that he had a roommate, and I asked him to identify his roommate, and he refused.

"I asked him if he'd mind if we went to his house and checked it over because I was of the opinion that he had committed burglaries of furniture stores in the city of Burbank, and he stated at this time that we could go up to his apartment.

"At this time he had approximately six keys in his possession and picked his house key out.

"Sgt. Cassiday and myself and the defendant went into his residence. . . .

"When we approached his house, we got out of the vehicle, and walked up to the door. At this time the defendant stated, 'Do you have any legal papers that give you the right to go into the house?'

"I said 'No, we do not, but if you want us to go back to the station, we will obtain a search warrant.' [On cross-examination, Detective Carsten also testified that he told respondent that it would be a "time saver" if respondent let him in the house without a warrant.]

"He said, 'Well, I'd like to call my attorney.'

"And I said, 'Well, call him.'

"And he said, 'Can I call him now?'

"And I said yes.

"The defendant put his key in the front door of his residence and opened the door and started to proceed into the house and turned around and said,

" You will have to wait outside.'

"I told the defendant that he could not go in the house alone because he was under arrest, and he'd have to be in my presence at all times.

"He stated, 'You may come in the house, but you will have to stand by me while I talk to my attorney on the phone, and I don't want you to leave my side.'

"I said, that was quite all right. So the three of us proceeded into the house and the defendant went to the phone and at that time called his attorney. . . ."

While waiting by respondent's side, Detective Carsten noticed several articles of furniture in respondent's home which matched the description of stolen property on the police reports of the prior burglaries. These articles were in plain sight. With the attorney's permission, he checked the serial number on one of the articles, a world globe, and it matched the serial number of a similar article taken in one of the burglaries under investigation.

Carsten then testified:

"I then went back to the phone and told Attorney Leon that I had identified the world globe by the numbers. Q. What did Mr. Leon say at that time? A. He said he was quite shocked, the defendant was a close friend of his. Q. What then took place? A. That was the end of the conversation with Mr. Leon

and we asked the defendant if he had any other stuff in the house and he said, 'No, take a look.'

"And we—there was a room with a door closed, and we said we'd like to look in there, and he said 'Go ahead.'

"And I says, 'Well, walk with us.' He walked with us and also walked to the back bedroom and then approximately 12:30 a.m., one o'clock in the morning, Attorney Leon showed his presence.

"Q. By showing his presence, you mean he arrived at Mr. Carr's apartment? A. Right. Q. What happened then? A. He asked if he could talk to the defendant alone in the bedroom which we stated he could. They talked for approximately a half an hour. Q. Then what happened? A. Mr. Leon left and we called the station for an officer to take pictures, and Officer Miner arrived and took photographs in my presence."

On cross-examination Carsten testified:

"Q. By Mr. Jaffe: The items of property that you saw in the house which you later—strike that.

"The items that you saw in the house you remembered from previous reports? A. Yes, sir, and when I was at Lewin's I believe that Mrs. Lewin showed me pictures of the chairs."

Nothing appears in the record to suggest that there was any objection to Officer Miner's entry for the purpose of taking pictures. The following day a search warrant was obtained and the property seized.

The only questions on this appeal are whether respondent's consent to enter was voluntarily given, and, if so, whether it was so limited that the conduct of the police after entering violated the scope of that permission.

We think the consent was validly given. In *People* v. *Michael*, 45 Cal.2d 751, it is stated at p. 753 [290 P.2d 852]:

"To protect his right to object to an unreasonable search or seizure a defendant need not forcibly resist an officer's assertion of authority to enter his home or search it or his person [citations], but if he freely consents to an entry or search, or voluntarily produces evidence against himself, his constitutional rights are not violated and any search or taking of evidence pursuant to his consent is not unreasonable. [Citations.] Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, it is a question of fact to be determined in the light of all the circumstances."

Although, each case must be decided on its own facts, a brief review of some of the cases may be helpful in construct-

ing guidelines to aid us in our determination of whether consent herein involved was freely given.

Consent is not invalid merely because the defendant was under arrest at the time he gave it. (*People* v. *Fischer*, 49 Cal.2d 442, 448 [317 P.2d 967]; *People* v. *Amiotte*, 215 Cal. App.2d 176, 179 [30 Cal.Rptr. 102]; *People* v. *Smith*, 63 Cal.2d 779, 798 [48 Cal.Rptr. 382, 409 P.2d 222].) A consent given by a defendant under arrest has been held invalid when concurrent facts reveal that it was not genuine. (*People* v. *Gorg*, 45 Cal.2d 776, 782-783 [291 P.2d 469] (words of consent ambiguous in meaning); *Castaneda* v. *Superior Court*, 59 Cal.2d 439, 443 [30 Cal.Rptr. 1, 380 P.2d 641], and *People* v. *Green*, 235 Cal.App.2d 506, 512 [45 Cal.Rptr. 371] (attempt to deceive police as to whereabouts of home or car to be searched); *People* v. *Haven*, 59 Cal.2d 713, 718-719 [31 Cal. Rptr. 47, 381 P.2d 927] and *People* v. *Theobald*, 231 Cal.App. 2d 351, 357 [41 Cal.Rptr. 758] (consent and search were inextricably bound up in an illegal arrest or entry); *People* v. *Currier*, 232 Cal.App.2d 103, 110 [42 Cal.Rptr. 562] (previous denial by defendant that site of search was his residence, withholding key from police, plus other circumstances of which arrest was only one); *People* v. *Shelton*, 60 Cal.2d 740, 745 [36 Cal.Rptr. 433, 388 P.2d 665] (refusal to assist police in gaining access to the apartment).)

These cases, as we interpret them, hold that consent given while under arrest, is not per se proof that it was given only because of the assertion of authority inherent in the arrest, nor is it conclusive that it is a free consent. There must be in addition an absence of facts and circumstances which indicate that such consent does not truly reflect a defendant's state of mind. In short, the police may not rely solely on what the defendant says. If, despite the apparent consent, it is clear from all facts and circumstances that a defendant *in fact* did not mean what he said, then the consent will be considered as having been the result of the assertion of authority implicit in the arrest.

The facts in the case at bench show a valid arrest. There is nothing to show that respondent was intimidated or his will overborne by the fact of his arrest at the time he gave the police consent to enter. An objective analysis indicates that respondent and his attorney were in complete control of the situation at all times. When the police stated in answer to respondent's query as to whether or not they had ''legal papers,'' that his consent to a search then and there would be more expedient than requiring them to obtain a search war-

rant, he insisted on calling his attorney and expressed his unwillingness to have them enter. When the police informed him he was under arrest, and could not enter without them, respondent was faced with a clear choice: he could call from his home phone in the presence of the police, or he could refrain from calling at that moment and prevent the police from entering. The fact that he chose to call does not prove that he thought he had no choice at all. The record discloses that he restricted the police's right of entry and freedom inside the house which indicates that he was fully aware of his rights and was cautious in granting a restricted waiver.

For the foregoing reasons, we hold that respondent's consent was validly given and the police were legally in the house.

Respondent also contends that once inside, the police exceeded the scope of the limited entry granted them. The record, however, does not support the contention.

Detective Carsten, as instructed by respondent, did not leave respondent's side until explicitly given permission to do so by respondent's attorney. Respondent does not argue that the attorney had no authority to permit such a departure from the previous instructions. Moreover, the articles of furniture identified by Detective Carsten as stolen were in plain view. No search was required or undertaken. (*People* v. *Roberts,* 47 Cal.2d 374, 379 [303 P.2d 721] ; *People* v. *Lindogan,* 212 Cal. App.2d 466, 471-472 [27 Cal.Rptr. 905].) Further investigation, such as checking the serial numbers, was at the request of respondent's attorney, and cannot be charged to the police as improper conduct.

Since we have concluded that the entry was proper, and that the further investigation was legal, we must reverse the order of the court setting aside the information as to counts II, III, and IV.

The order is reversed.

Herndon, J., and Fleming, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 4, 1966.