[Crim. No. 7352. Second Dist., Div. One. Apr. 6, 1961.]

THE PEOPLE, Respondent, v. JACK LODGE, Appellant.

Daniel N. Busby for Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from the "judgment and sentence" imposed in a matter involving the receipt of stolen property.

In an information filed in Los Angeles County the defendant was charged in three counts with receiving stolen property on November 30, 1959, November 8, 1959, and November 9, 1959. Defendant pleaded not guilty and it was stipulated that the cause would be submitted on the transcript of the preliminary hearing and other testimony. The court found defendant guilty as charged in each count. Proceedings were suspended in each count and probation was granted for a period of three years upon condition that defendant spend three months in the county jail, that he make restitution and obey all laws. The sentences were to run concurrently.

A résumé of some of the evidence before the court is as follows:

On November 7, 1959, at about 1 p.m. Max Marks secured his home in Hidden Hills. About 9 p.m. of November 7, 1959, Phillip Swiger, without the permission of the owner thereof, entered into the Marks home and took therefrom without permission two matching suitcases, two firearms, a tuxedo, sewing machine, golf clubs, movie projector and some champagne. The stolen property was taken to the home of Frank Stamps in Canoga Park, where it was placed in Stamps' den and sitting room.

About 11:30 p.m. on November 7, 1959, Stamps, Jack Mercer, Dave Graham and Swiger went to the Westshire Radio and T. V. Store in Chatsworth and pried open the back door. They entered without the owner's permission and removed from the store four television sets, two radio clocks. six radios, six record players, two turntables and an amplifier set and a soldering iron. They took the items to the house of Stamps and placed them in his den.

About 1:30 a.m. on November 8, 1959, Stamps called the defendant and asked him to come to his house, saying that he "had some goods for him." About 2 a.m. the defendant arrived at Stamps' house. Stamps then told defendant that they "had the stuff there that was from the Wilshire [sic] Television Company" and Stamps further said to defendant

that "he could have the whole works that was there" for five hundred dollars. There was testimony that the defendant replied that "due to the fact that the goods were hot that we couldn't ask a wholesale price . . .," further that "he couldn't see paying wholesale prices for stolen merchandise." Defendant finally settled upon and paid the price of $375 for certain of the items in the room. Defendant took all of that which had come from the television store excepting two television sets, one radio, and the soldering iron. The defendant also took along the luggage and the tuxedo which were taken from the Marks' home. The tuxedo was a gift to the defendant from Stamps. Nothing definite was stated to defendant about just where the items which were taken from the Marks' home had been stolen or taken but defendant was told that such items had recently been stolen from a home.

When the owner of the television store in Chatsworth came to the place of business on November 8, 1959, he discovered pry marks on the back door and that several television sets, radios and record players were missing. He had given no one permission to enter the place and take the items which were gone.

About 1:15 p.m. on November 8, 1959, Marks returned to his home and discovered the broken rear window and that a sewing machine, television set, guns, camera, tuxedo and luggage were missing. He had given no one permission to enter the home and take the items which were gone.

On the afternoon of November 8, 1959, the owner of Master Buff Shoe Outlet Store in Canoga Park secured the premises. About 10 p.m. November 8, 1959, Swiger went with Stamps to the store and entered through a door which Mercer and Graham previously had opened for entry. Swiger went inside and removed over a hundred pairs of men's shoes and seven pairs of women's shoes without any permission from the owner. The shoes were taken to Stamps' garage where they were taken from Graham's car, sorted out and put back into the car. The shoes were then taken to the Shoe Market in Culver City. A conversation was had between the thieves and the manager of the store. Apparently the manager of the store was suspicious of the proposed transaction and apparently declined to purchase the shoes in question. The thieves then drove to the house of defendant in Culver City at about 2 p.m. Stamps went into the defendant's house and talked with him. When Stamps came out of the defendant's house they unloaded the shoes from the back of Graham's

car into the trunks of the cars of defendant. Defendant was present and witnessed the unloading process.

The owner of the Master Buff Shoe Outlet Store returned to the place of business on the morning of November 9, 1959, and discovered a rear window broken and over 125 pairs of shoes missing. No permission had been granted to anyone to enter and take such shoes.

On the morning of November 9, 1959, the defendant drove to the back of Langman's Shoe Store in Culver City and sold the shoes in question to Langman for about $4.00 per pair. The wholesale price of the type of shoe involved was about $1.50 to $2.00 under the current market price of such shoes.

About November 28, 1959, W. M. Anderson of Southern California Office Equipment Company secured and locked the premises at the end of the day's business. Anderson returned to the store about 11:30 a. m. November 30, 1959. The back door had pry marks on it and there were missing from the store some typewriters.

Hartly Gaylord, an optometrist with an office in Canoga Park secured his office about 2 p.m. November 29, 1959. He returned to his office about 8:30 a.m. November 30, 1959, and the rear door was open and he saw pry marks. About 200 frames for eyeglasses were missing. Some of the frames were worth about $4.00 each and others about $12 each. No one was granted permission to enter the office and remove such frames.

Joseph Tenen, an optometrist, knew the defendant and on or about December 1, 1959, defendant rang Tenen's doorbell and entered the house with a box containing over a hundred eyeglass frames. The doctor was asked by defendant if he wanted to buy the frames and defendant left them with the doctor to the end that the doctor could determine whether he wanted to purchase any of such frames. The doctor paid appellant $1.00 for each of the frames which he kept.

Officer Selby of the Los Angeles Police Department went with his associate, Sergeant de Ryk, to defendant's home about 9 p. m. on December 1, 1959. The officers, with defendant, went to the officers' parked car which contained about 84 pairs of shoes on the back seat. Selby asked the defendant about the shoes and whether he had received any other property from Stamps and defendant replied in the affirmative. The police asked to see the other property which defendant

had received from Stamps. Defendant opened his garage and there in view were several typewriters, which appeared to be new and upon each of which was a tag containing the name of Southern California Office Equipment Company. Defendant stated that he received the items from Stamps in the early morning of November 30, 1959, and that they had been brought there with some adding machines. Defendant indicated that he had already sold the adding machines and was going to sell the typewriters and then pay Stamps for same. The police took the typewriters into possession. Upon leaving the garage they all went into the house and defendant was asked if there was any other property which he had received from Stamps and defendant answered in the negative. A radio in the front room was pointed out to defendant and he said it had been received from Stamps. Two radios in the bedrooms were pointed out to defendant and he said that they had not been received from Stamps. A movie projector and some luggage also were pointed out to defendant and he replied that he had not secured such items from Stamps.

About 11 p. m. on December 1, 1959, the police took defendant to a substation where defendant was confronted with Stamps. On at least two occasions during that session defendant, when accused of knowing that the items were stolen, said ''I did have my doubts it was legitimate property, yes.'' That conversation was taped.

On December 10, 1959, in the afternoon Officers Selby and de Ryk talked with defendant at his home about the eyeglass frames, portable radios and record players. When a movie projector was pointed out defendant said, ''Yes, that is the one I told you previously belonged to some member'' of his family, and then stated, ''That is the one I previously received from Frank Stamps.'' It was established that the movie projector in question was stolen in a burglary. Officer Selby at the same time ''recovered a cardboard box containing approximately 200 pairs of eyeglass frames''; also he recovered three small radios. They then went to an establishment which defendant said was the home of his sister, where the officers picked up three radios, which appellant said he had received from Stamps.

Appellant's sole contention on appeal is that the evidence was insufficient to support the judgment.

Without stating the rule over and over again, this court

is bound by what is said in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].

█ In *People* v. *Gould,* 111 Cal.App.2d 1, 4 [243 P.2d 809], it is set forth:

"The elements of the offense created by the code are as follows:

"1. That the property found in the possession of the defendant was acquired by acts constituting theft or extortion;

"2. That the defendant received, concealed or withheld the property from the owners; and

"3. That defendant knew the property was stolen. (*People* v. *Rossi,* 15 Cal.App.2d 180, 181 [59 P.2d 206].)

█ █ "The basic rules here applicable are that an appellate court 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt' and that before a judgment of conviction 'can be set aside on appeal upon the ground of insufficiency of the evidence, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . █ We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict. █ *If the circumstances reasonably justify the verdict . . . the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.'* (Italics added.) (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Green,* 13 Cal.2d 37 [87 P.2d 821]; *People* v. *Jones,* 36 Cal.2d 373 [224 P.2d 353].)"

There is no question about the identity of the property which was stolen or that the property was so stolen. Nor is there any question about whether appellant received the property. Appellant seems to argue that he did not know the property in question was stolen and that therefore the judge should have found him to be not guilty.

█ It was stated in *People* v. *Boinus,* 153 Cal.App.2d 618, 621-622 [314 P.2d 787]:

"Although guilty knowledge of the fact that the property was stolen is an essential fact to be proved in a prosecution

for receiving stolen property, such knowledge need not be that actual and positive knowledge which is acquired from personal observation of the fact. (*People* v. *Boyden,* 116 Cal.App.2d 278, 287 [253 P.2d 773].) It is not necessary that the defendant be told directly that the property was stolen. (*People* v. *DeVaughn,* 136 Cal.App. 746, 751 [29 P.2d 914].) Knowledge may be circumstantial and deductive. (*People* v. *Bycel,* 133 Cal.App.2d 596, 599 [284 P.2d 927] ; *People* v. *Hartridge,* 134 Cal.App.2d 659, 665 [286 P.2d 72].) ▮▮ Among the elements from which knowledge may be inferred are that the property was obtained from a person of questionable character (*People* v. *Stollmack,* 18 Cal.App.2d 471, 477 [64 P.2d 162]), and the failure of the accused to satisfactorily explain his possession. (*People* v. *Juehling,* 10 Cal.App.2d 527, 531 [52 P.2d 520].) ▮▮ Possession of stolen property, accompanied by an unsatisfactory explanation of the possession or by suspicious circumstances, will justify an inference that the property was received with knowledge it had been stolen. (*People* v. *Malouf,* 135 Cal.App.2d 697, 707 [287 P.2d 834].) It is enough if, considering all the evidence, which may be circumstantial, an inference of guilt may be found. (*People* v. *Goodall,* 104 Cal.App.2d 242, 247 [231 P.2d 119].) ''

▮▮ Appellant himself stated in effect that the property taken from the television store was ''hot.'' Stamps told the appellant that the luggage and the tuxedo had just been stolen from a home. The items were delivered to appellant at 2 a. m., which would indicate something other than the ordinary course of business.

The shoes were delivered at or about 2 a. m. also. We think that appellant, having been told that the first group of items was stolen, must have known that the shoes were stolen when we consider that he was making the purchase from the same thieves he had previously dealt with.

The typewriters all bore a tag showing that Southern California Office Equipment Company had some connection with such items. The tags, along with the hour of delivery from the people he was dealing with, supports an inference that appellant was aware that the machines were stolen. (See *People* v. *Wright,* 153 Cal.App.2d 35, 39 [313 P.2d 868].)

The appellant told the officers untruths about certain of the items in his house, saying in effect in the first instance that he had not received them from Stamps and then later admitting to the contrary. In other words, appellant gave an unsatisfactory explanation of where the property came from. Further-

more the appellant stated at the police station that he himself had some doubts about the legitimacy of the property in question.

The judge was not required to believe the appellant in his statements to the effect that he did not know the property was stolen. The weight to be given to the testimony was the province of the trial court. There is no good reason for this court to interfere with the rulings, order, judgment and sentence of the trial judge in this case.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.