[Crim. No. 4504. First Dist., Div. One. May 3, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. MANUEL RAMIREZ ESTRADA, Defendant and Appellant.

Bernard F. Cummins, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and John F. Kraetzer, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, P. J.—A jury found defendant guilty of possession of a narcotic (heroin) (Health & Saf. Code, § 11500), receiving stolen property (Pen. Code, § 496) and possession of a weapon by a person convicted of a felony (Pen. Code, § 12021).[1] He appeals from the judgment of conviction.

On April 23, 1963, a search warrant was issued to San Jose Police Sergeant Donald Ewing by a judge of the Municipal Court for the San Jose-Alviso Judicial District, County of Santa Clara, authorizing the search of three houses including "the apartment house occupied by MANUEL ESTRADA at 18 S. 19th Street, San Jose," automobiles in the custody of defendant at each place including "in particular, a 1955 Chevrolet automobile, California license number DFA 066 used by said MANUEL ESTRADA," and of the person of said defendant. The warrant was directed to the discovery of narcotics and narcotic paraphernalia.

---

[1]On defendant's motion made before trial pursuant to Pen. Code, § 995 the court set aside a count of the indictment charging him with selling heroin (Health & Saf. Code, § 11501). The jury also found defendant not guilty of possession of marijuana (Health & Saf. Code, § 11530) as charged in a separate count of the indictment.

In the afternoon of the same day Sergeant Ewing went to 18 South 19th Street and from a vehicle parked across the street kept the apartment house under surveillance. At about 4 p.m. he saw defendant leave the building in a car. Ewing immediately radioed other officers to follow and overtake defendant. He himself remained where he was with the search warrant in his possession.

San Jose Police Sergeant Stanley M. Hardman and Deputy Sheriff Stanley E. Shaver, who had been participating in the "stakeout" at the apartment house, followed defendant in separate cars and eventually intercepted him about a mile away. The two officers approached the car on different sides. Shaver ordered defendant out of it, placed him under arrest handcuffed him and proceeded to search his person. He had no warrant for defendant's arrest. Although Shaver testified on direct examination that up to the time defendant alighted from the car he had committed no misdemeanor in his presence, he also stated under cross-examination that he had arrested defendant for marked drug addiction in violation of Health and Safety Code section 11721, a misdemeanor. Recalled by the prosecution later in the trial, Shaver testified that at the time he arrested defendant and in response to the latter's request as to "what this was all about," he told defendant that he was under arrest for the sale of heroin.

The search of defendant's person produced $630 in currency, a wallet and a toy balloon. Although Officer Shaver testified that in making the search they were operating under the above-mentioned search warrant, he also stated that he did not have the warrant in his possession at the time of the search and defendant was never provided with a copy of it.

After he was searched, defendant was taken back to his apartment house in Hardman's car. Hardman drove and defendant sat in the rear seat in the custody of Deputy Sheriff Aslanian who, on defendant's complaint that his handcuffs were too tight, handcuffed him in front instead of behind. During the ride defendant was smoking a cigarette, a circumstance claimed to be of some significance. At the time of the arrest, about 4:15 p.m., both Shaver and Hardman had seen needle marks on defendant's arms. While no one saw defendant burn his arms, at 7:30 p.m. the marks were no longer visible and in their place were burns and blisters showing a charring and discoloration of the flesh. Defendant told Shaver that he received the burns at work on a hot pipe.

On arrival at the apartment house, Hardman left defendant in the car in the custody of another officer and handed over to some of the other officers a key to an "Apartment C" which he had taken from defendant. Although Shaver testified that defendant was not provided with a copy of the warrant, Sergeant Ewing testified that at about this time he went down to the car where defendant was, showed him the search warrant and started to read it, whereupon defendant stated "I can read." Ewing then showed defendant the original warrant and gave him a copy.

Shaver and another officer then attempted to enter defendant's apartment by using the key but, finding the door locked on the inside, had to kick it in. They found there one Dolly Gonzalez, a person known to the police as a narcotics addict. Sergeant Ewing and the other officers followed them in and all of the group then commenced a search.

There were four apartments in the building, apartments A and D on the lower floor and apartments B and C on the upper floor. Only apartments A and C were occupied—the former by the manager Mrs. Smith and the latter by defendant. Defendant had moved into apartment C approximately a month before; prior to that time it had been vacant for three months.

The search made by the officers revealed the following: Deputy Sheriff Shaver found some toy balloons on an ironing board in the center of the dining area where the woman, Dolly Gonzalez, was standing. Shaver and Hardman found pieces of balloons, bindles, or squares of paper, inside a paper sack used to hold trash in defendant's kitchen. Four of the used bindles or pieces of paper contained the residue of a powdery substance later found to be heroin. Hardman found some unused bindle papers in the top of a shoe box on top of the refrigerator. Shaver was also present when a garbage can located outside the building marked "Apartment C" was searched and found to contain more pieces of balloons and squares of paper.

In defendant's room, Sergeant Ewing found some empty balloons on the night stand and a torn piece of the San Jose Mercury-News dated April 21. Sergeant Ewing then searched a back porch connected to defendant's apartment and the apartment next door, discovered a trap door, and upon searching the interior leading from the trap door, discovered a small piece of brown wrapping paper containing a green leafy substance later identified as marijuana.

Deputy Shaver searched the exterior of the building. His

first discovery on a ledge underneath the building was of two packages of balloons. He then searched a growth of ivy on a fence alongside the building and discovered a bag containing seven balloons which were untied but rolled in such a way that the contents wouldn't spill out. Each balloon contained paper bindles in each of which there was a powdery substance later identified as heroin.

In the ivy, about 2 feet from where he found the balloons, he also found a package wrapped in a piece of the San Jose Mercury-News dated April 21, 1963, containing a blackened spoon, three hypodermic needles, two eyedroppers and needle holders. The spoon was subsequently tested and the results of the test revealed that traces of heroin remained on the spoon. The piece of newspaper which was wrapping the paraphernalia was subsequently found to match the piece of newspaper discovered in defendant's bedroom.

Sergeant Hardman found some weapons buried in the ground between the building and the ivy covered fence, about 3 feet from the place where Shaver found the balloons. The weapons which were found were later identified as belonging to one Frank Cortez, the owner of a sports shop at 979 North Main Street, Salinas, from which the weapons, two Derringers and four revolvers, were stolen sometime during April 22 or 23. At least one Derringer and five rifles stolen from the shop were not recovered. Among the rifles was a Browning .22 automatic.

On April 24, 1963, the day after defendant's arrest and the search of his apartment, Sergeant Hardman made a search of defendant's car and discovered a Browning automatic .22 registration card. In the trunk of the car he found a shovel which had some soil on it. Hardman took a sample of the soil on the shovel and a sample of soil from the area where he found the weapons buried, together with a sample of grass from that area, and took all three samples to the Criminalistics Laboratory for the Santa Clara County District Attorney's office. The tests showed that the two samples of soil were very similar and that the grass in both samples was of the same species. No fingerprint tests were taken from the shovel. The registered owner of the car was not the defendant but a Mr. David Rios Garcia, who had been convicted for possession of narcotics paraphernalia.

On April 29, 1963, Deputy Shaver resumed his search of the exterior of the building at 18 South 19th Street with the manager's permission. He found, buried in the ground, a jar

containing a rubber prophylactic. The contents of the prophylactic were later identified as heroin.

Defendant did not take the stand nor did he call any witnesses in defense. After the prosecution rested at the conclusion of its case in chief, counsel for both parties stipulated that David Rios Garcia, the registered owner of the car driven by defendant, had pleaded guilty to a violation of Health and Safety Code section 11555 (possession of narcotic paraphernalia) as charged in a complaint filed in the Municipal Court for the San Jose-Alviso Judicial District on December 4, 1961.[2]

*The legality of the search warrant.*

Defendant contends that the search warrant under which the search and seizure were carried out was void since it failed to describe the premises to be searched with sufficient particularity to satisfy constitutional and statutory requirements.[3]

In the instant case, after stating that there was probable cause for believing that certain narcotics and narcotic paraphernalia were concealed ''in the apartment house occupied by MANUEL ESTRADA at 18 S. 19th Street, San Jose, the second story of a white house located at the North-East Corner of 19th and William Streets, San Jose, a house at 919 Tomlinson Lane, San Jose, together with the garages, outbuildings and automobiles located at and under the custody of MANUEL ESTRADA at each of the above addresses; and in particular, a 1955 Chevrolet automobile, California license number DFA 066, used by said MANUEL ESTRADA; and on the person of the said MANUEL ESTRADA,'' the warrant directed an ''immediate search of the premises, automobiles and persons described above'' for said property.

The gist of defendant's attack on the warrant is that it thereby directed an unlimited search of the apartment house although defendant occupied only one apartment in the building and that, being in effect a general or ''blanket'' warrant, it was therefore invalid.

At the outset we observe, as indeed both parties point out to us, that relatively few reported decisions in California have discussed the specificity required in a search warrant in respect

[2]In his brief filed herein defendant states that ''His defense consisted solely in showing that the owner of the automobile involved had pleaded guilty to a charge of possession of a narcotics outfit.''

[3]Defendant does not attack the sufficiency of the affidavit in support of the warrant, the sufficiency of the description of the property directed to be seized, or the manner in which the warrant was executed.

to its description of the place to be searched. Since the Fourth Amendment of the United States Constitution is enforceable against the states through the due process clause of the Fourteenth (*Mapp* v. *Ohio* (1961) 367 U.S. 643, 655, 660 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933]) we must satisfy ourselves that the warrant here under scrutiny measures up to federal constitutional standards as well as to standards prescribed by California. An examination of federal cases dealing with the issue before us is at once necessary and helpful. While we are bound by decisions of the United States Supreme Court interpreting the federal Constitution (U.S. Const., art. VI, § 2; *Mackenzie* v. *Hare* (1913) 165 Cal. 776, 779 [134 P. 713, Ann.Cas. 1915B 261, L.R.A. 1916D 127], affirmed 239 U.S. 299 [36 S.Ct. 106, 60 L.Ed. 297]; *Moon* v. *Martin* (1921) 185 Cal. 361, 366 [197 P. 77]; *Perkins Mfg. Co.* v. *Jordan* (1927) 200 Cal. 667, 678-679 [254 P. 551]; *Turkington* v. *Municipal Court* (1948) 85 Cal.App. 2d 631, 650 [193 P.2d 795]) we are not bound by the decisions of lower federal courts even on federal questions although they are persuasive and entitled to great weight. (*Stock* v. *Plunkett* (1919) 181 Cal. 193, 194-195 [183 P. 657].) However, since the provisions of both the federal and state Constitutions here pertinent are practically identical (see fns. 4 and 5, *infra*), we feel that the latter group of decisions are uniquely persuasive. (See *Cohen* v. *Superior Court* (1959) 173 Cal.App.2d 61, 67 [343 P.2d 286].)

 Under both the United States Constitution and the Constitution and statutory law of California it is essential to the validity of a search warrant that it describe with particularity the place to be searched. (U. S. Const., 4th Amend.;[4] Cal. Const., art. I, § 19;[5] Pen. Code, § 1525.[6]) As a

[4]U.S. Const., 4th Amend. provides: ''The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.''

[5]Cal. Const., art. I, § 19 provides: ''The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, shall not be violated; and no warrant shall issue, but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized.''

[6]Pen. Code, § 1525, provides: ''A search-warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched.''

146

general rule all that is required by the Fourth Amendment is that the description be ''such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended. [Citations.]'' (*Steele* v. *United States No. 1* (1925) 267 U.S. 498, 503 [45 S.Ct. 414, 69 L.Ed. 757]; *United States* v. *Joseph* (D.C.E.D. Pa. 1959) 174 F. Supp. 539, 544, affd. (3d Cir. 1960) 278 F.2d 504, cert. denied 364 U.S. 823 [81 S.Ct. 59, 5 L.Ed.2d 52]; *United States* v. *Thomas* (D.C.N.D. Cal. 1963) 216 F. Supp. 942, 946; *United States* v. *Poppitt* (D.C. Del. 1964) 227 F.Supp. 73, 76; *United States* v. *Klaia* (2d Cir. 1942) 127 F.2d 529, 530; *United States* v. *Falcone* (2d Cir. 1940) 109 F.2d 579, 582.)

■ However the requirement of the Fourth Amendment that a particular ''place'' be described in the warrant when applicable to dwellings means a single living unit, that is to say the residence of one person or family, and a warrant describing an entire building issued on probable cause for searching only one apartment therein is void. (*United States* v. *Hinton* (7th Cir. 1955) 219 F.2d 324, 326; *United States* v. *Barkouskas* (D.C.Pa. 1930) 38 F.2d 837, 838; *United States* v. *Chin On* (D.C.Mass. 1924) 297 F. 531, 533; *United States* v. *Innelli* (D.C.E.D.Pa. 1923) 286 F. 731, 732-733; *United States* v. *Mitchell* (D.C.N.D.Cal. 1921) 274 F. 128, 130-131.) ■ Accordingly when a warrant directs a search of a multiple occupancy apartment house or building, absent a showing of probable cause for searching each unit or for believing that the entire building is a single living unit, the warrant is void and a conviction obtained on evidence seized under it cannot stand. (*Tynan* v. *United States* (9th Cir. 1924) 297 F. 177, 179; *United States* v. *Hinton, supra,* 219 F.2d 324, 326; *United States* v. *Poppitt, supra,* 227 F.Supp. 73, 76.) ■ As the court said in *Hinton, supra,* ''The basic requirement is that the officers who are commanded to search be able from the 'particular' description of the search warrant to identify the specific place for which there is probable cause to believe that a crime is being committed. This requirement may be satisfied by giving the address of the building *and naming the person whose apartment is to be searched.*'' (Italics added.) (*United States* v. *Hinton, supra,* at p. 326, citing *Kenney* v. *United States* (C.A.D.C. 1946) 157 F.2d 442; *Shore* v. *United States* (C.A.D.C. 1931) 49 F.2d 519 [60 App.D.C. 137], cert. denied 283 U.S. 865 [51 S.Ct. 656, 75 L.Ed. 1469]; in accord: *United States* v. *Poppitt, supra,* 227 F.Supp. 73, 76.)

Both *Shore* and *Kenney* upheld search warrants which, while giving the address of the entire premises involved, contained qualifying language limiting the search to that portion occupied by a particular person. In *Shore* the warrants directed a search of "the premises of one Frank Shore, said premises being described as 1223 New York Avenue Northwest . . . District of Columbia." Shore owned the entire building which contained not only his garage and tire shop but a small lunch room occupied by another person. On the third floor two rooms were occupied, one by Shore and the other by his codefendant. Neither the lunch room nor the upstairs was searched. On the authority of *Steele* v. *United States No. 1, supra,* 267 U.S. 498, the court held that the description sufficiently identified the premises to be searched. In *Kenney, supra,* the warrant directed a search of "premises occupied by William C. Kenney and over which he has possession and control . . . said premises being described as 2211 N Street, N.W., Washington, D.C." The same court as in *Shore* upheld the warrant, even though the premises contained two apartments, the apartment occupied by Kenney being the only one searched.

In *United States* ex rel. *Sunrise Products Co.* v. *Epstein* (D.C.E.D.N.Y. 1929) 33 F.2d 982 a search warrant directed a search of premises "at Nos. 718-728 Atlantic Avenue, Brooklyn. . . ." The firm involved in the search occupied only a part of the fourth floor of the building located at said address. After analyzing a number of cases upholding and striking down search warrants, the court said: "It is seen, therefore, that the authorities are not in agreement as to the requisites of a description of the place named in the warrant; but in none of the foregoing cases does it appear that the legality of any warrant was sustained in the absence of language sufficiently definite to enable the searching officer to identify either the person or the *specific* premises to be searched. In those cases, for example, which hold a warrant to be valid which directs a search of an apartment house or other building occupied by divers persons, the particular part of such apartment house or building is by limitation confined either to premises therein occupied by a certain stated person or persons, or by designation of a certain part of the building, or as in *Steele* v. *United States No. 1,* cited hereinbefore, by a description of the character of the business carried on in the particular premises to be searched." (P. 984 [267 U.S.].) The court thereupon concluded that the warrant before it did

not fall within the limitations stated because it specified the entire building without naming the firm involved in the search or any other person or firm.

Defendant has in the instant case referred us to, *inter alia,* three cases discussed by the court in *Epstein,* namely, *United States* v. *Mitchell, supra,* 274 F. 128; *United States* v. *Innelli, supra,* 286 F. 731; and *United States* v. *Chin On, supra,* 297 F. 531. In all three the search warrants were held invalid. It is convenient here to note that in none of the cases was there language in respect to the occupancy of the premises sufficient to limit the description and render the place to be searched identifiable. In *Mitchell, supra,* the warrant directed the search of the entire premises at 880 Bush Street, San Francisco, an apartment house where defendant occupied only one apartment. In *Innelli, supra,* the warrant directed the search of premises "described by street and number, and the name of the person to whom the premises then or formerly belonged." The court reasoned that "the second floor of the premises belonged to a transportation company" and thus the entire premises did not "belong" to the person whose place was intended to be searched. In *Chin On, supra,* the warrant directed the search of a room or rooms on the third floor of a building at 24 Liberty Street and occupied by a person identified by a certain name. This person actually lived next door so that the erroneous description by occupancy was ineffective to specify any rooms to be searched. As stated earlier, all these three cases fall within the rule that a warrant describing an entire building without more, but issued on probable cause for searching only a part of it, is void.

Our examination of the foregoing authorities convinces us that the following rule may be distilled from *Steele, Epstein, Hinton* and *Poppitt* for testing the specificity of a search warrant directed to premises with multiple occupants: If the description in the warrant limits the search to a particular part of the premises either by a designation of the area or other physical characteristics of such part or by a designation of its occupants, the business conducted there, or otherwise so that the officer executing the warrant can with reasonable effort identify the place to be searched, the warrant will meet Fourth Amendment requirements in respect to the description of the place to be searched. In our opinion if measured by the same test it will also meet the corresponding California constitutional and statutory requirements.

We believe that the warrant here under attack meets

such a test. Its language—"the apartment house occupied by MANUEL ESTRADA at 18 S. 19th Street, San Jose"—while not the optimum in careful and precise description, does indicate that it was the premises *occupied* by defendant which were to be searched. It is to be noted that the warrant, unlike many thereby found invalid, does not merely direct the search of the *entire* premises without any limiting language as to occupancy so that portions of it occupied by innocent persons would fall within the search. It seems to us that the officers executing the warrant could, as they apparently did, without confusion or excessive effort, identify the part of the premises to be searched.[6a] This was defendant's apartment and the exterior area to which defendant as a tenant had permissible access.

*The legality of the arrest and search of defendant.*

Defendant next contends that his arrest and the subsequent search of his person were illegal. He argues that no misdemeanor was committed in the presence of the arresting officers, that they had no warrant for his arrest, and that their search of his person could not have been legally made pursuant to the issued search warrant which was not in their possession at the time.

We must first set forth some pertinent facts. At the trial, Deputy Shaver, one of the arresting officers, was the first witness for the prosecution. In narrating the circumstances of defendant's arrest, he stated at the outset that in making the arrest he was operating under the search warrant. His testimony, however, disclosed at the same time that he did

---

[6a]On cross-examination Shaver testified that on April 23, 1963, he searched defendant's apartment (Apartment C) but not all of it and then left by an outside stairway to search the exterior of the building. Although he returned for a further search of the outside on April 29, he stated that April 23 was the only day on which he was inside the building although he was "in and out of it two or three times" that day. During his cross-examination the following occurred: "Q. [By Mr. Ash, defense counsel] You're sure of two [apartments upstairs]. Did you search the entire apartment house or just this one apartment you describe as Apartment C? A. I searched Apartment C. There is also a vacant apartment upstairs. I asked the manager who lived there. MR. ASH: Now, I'm going to object to that, Your Honor, and ask that be stricken as to what the manager had to say out there. THE COURT: All right. It may be stricken. THE WITNESS: I entered the vacant apartment upstairs, nobody in there. There was no one there." The implication of this testimony is that Shaver entered the vacant apartment probably with the permission of the manager. Shaver did not testify that he searched this apartment or entered it under the authority of the search warrant.

not have the warrant with him but that Sergeant Ewing had kept it at his post back at the apartment house. During the ensuing *voir dire* examination Shaver also admitted that defendant had not committed any misdemeanor in the presence of the officers. Confronted with defendant's immediate objection based on such testimony that defendant's arrest was illegal and that all statements of defendant and all physical evidence which were products of such arrest, were therefore inadmissible, the prosecution apparently decided to establish that the search of defendant's person was legal as incidental to a lawful arrest made upon probable cause to believe that defendant had committed a felony, to wit, sale of heroin.

The prosecution's plan in this respect, however, was not put into action until the fourth day of the trial by which time the prosecution had introduced the testimony of most of its witnesses. At this point, in proceedings outside of the jury's presence, the prosecution again urged that the search of defendant's person was lawful under the search warrant, since it was not essential that the warrant be served before the search, it having been served on defendant shortly thereafter when he was returned to the apartment house. At the same time, the prosecution urged as additional grounds for the search of defendant's person that it was incidental to a lawful arrest. Over defendant's objections,[7] the court then permitted the prosecution to introduce the testimony of Sergeant Hardman, who with Shaver had arrested defendant, in order to establish reasonable cause for such arrest.

Hardman then testified outside the jury's presence that he had known defendant since March 10, 1963; that prior to that date he had heard from an officer of the burglary detail that one Muciellego was receiving stolen property at his residence in exchange for heroin; and that on or about March 10, 1963, State Narcotics Agent Armenta identified Murciellego as defendant Manuel Estrada, furnishing Hardman with defendant's personal information and a photograph. Hardman was told by Armenta that the State Narcotics Bureau "had an impending sale of narcotics against him" and

---

[7]One of defendant's objections was based on the fact, already noted *supra*, that Shaver the other arresting officer had testified on the first day of trial under cross-examination that he had arrested defendant for "Section 11721 of the Health & Safety Code, marked drug addiction." However, as previously noted, Shaver was recalled by the prosecution on the fourth day of the trial and after Hardman's testimony hereafter referred to. Shaver then testified that upon further reflection he recalled that at the time of defendant's arrest he informed the latter that he was being arrested for the sale of heroin.

had him under investigation. On March 12 State Narcotics Agent Murphy, according to Hardman, told the latter that "Murciellego or Manuel Estrada had sold some heroin to a special employee" of the bureau on that day in San Jose. Subsequently the state agents discussed the circumstances of the sale with Hardman personally.

Hardman further testified that he thereafter spent considerable time attempting to locate defendant's residence and that "Then confidential and reliable informants commenced bringing up this name constantly as a dealer, what they call a 'Big Go' as far as narcotics." These informants had given the witness information in the past leading to the arrest of four individuals prior to April 23, 1963, (the date of defendant's arrest) and to their subsequent conviction. From such informants, Hardman stated, he learned that defendant's new address was 18 South 19th Street, San Jose and that defendant's car was a 1955 Chevrolet, license number DFA-066 which was the car in which defendant was later arrested. Hardman thereafter spent considerable time checking defendant's residence and on one occasion saw defendant driving his car in the company of Dolly Gonzalez whom he knew to be in the narcotics traffic and a user of narcotics and to have been convicted of narcotic offenses and whom he had seen almost without exception in the company of persons using or trafficking in narcotics.

The witness further testified that at the time of the arrest he did not inform defendant that he was charged with the sale of narcotics. He did not book him for such charge because the State Narcotics Bureau was conducting an additional investigation and such action would put the special employee involved in the sale in jeopardy. Hardman had advised the state agents that he and his officers would execute the search warrant but "we would not mention anything about the sale unless it was necessary." Hardman testified that defendant was indicted for the sale of heroin[8] following his arrest, that if he, Hardman, had had no other basis on which to book defendant at that time he would have booked him for sale of narcotics, but having discovered evidence of defendant's use of narcotics (the marks on his arms and the evidence in the apartment) he was thus afforded an opportunity to book de-

---

[8]The first count of the indictment (later dismissed, see fn. 1, *ante*) charged defendant with selling heroin on March 12, 1963, in Santa Clara County. This was the date of the sale in San Jose according to information given Hardman by Agent Murphy.

fendant for a violation of Health and Safety Code section 11721.

We are satisfied that the foregoing information afforded the officers reasonable cause to arrest defendant and to make a reasonable incidental search of his person. (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577], cert. denied 364 U.S. 841 [81 S.Ct. 79, 5 L.Ed.2d 65]; *People* v. *Torres* (1961) 56 Cal.2d 864, 866 [17 Cal.Rptr. 495, 366 P.2d 823], cert. denied 369 U.S. 838 [82 S.Ct. 866, 7 L.Ed.2d 842]; *People* v. *Fischer* (1957) 49 Cal.2d 442, 446 [317 P.2d 967]; *People* v. *Swayze* (1963) 220 Cal.App.2d 476, 488 [34 Cal.Rptr. 5]; *People* v. *Cedeno* (1963) 218 Cal.App.2d 213, 219 [32 Cal.Rptr. 246].) Hardman had received information not only from other law enforcement officers but also from other informants known by him to be reliable. ▮ It is well settled that in making an arrest and search without a warrant, police officers may rely on information coming to them from official sources (*People* v. *Schellin* (1964) 227 Cal.App. 2d 245, 251 [38 Cal.Rptr. 593]; *People* v. *Davis* (1962) 205 Cal.App.2d 517, 521 [23 Cal.Rptr. 152]; *People* v. *Stewart* (1961) 189 Cal.App.2d 176, 178 [10 Cal.Rptr. 879]; *People* v. *Gorg* (1958) 157 Cal.App.2d 515, 520 [321 P.2d 143]; *People* v. *Hood* (1957) 150 Cal.App.2d 197, 201 [309 P.2d 856])[9] as well as information from other informants known by them to be reliable. (*People* v. *Boyles* (1955) 45 Cal.2d 652, 656 [290 P.2d 535]; *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294-295 [294 P.2d 36]; *People* v. *Swayze, supra*; *People* v. *Cedeno, supra*; *People* v. *Burke* (1962) 208 Cal.App.2d 149, 155-156 [24 Cal.Rptr. 912]; *People* v. *Bates* (1958) 163 Cal.App.2d 847, 851 [330 P.2d 102].)[10]

*The reference to the sale of narcotics.*

▮ Defendant next contends that the reference in the presence of the jury to a sale of narcotics by him was prej-

---

[9]See also *People* v. *Ross* (1962) 206 Cal.App.2d 542, 546 [24 Cal.Rptr. 1]; *People* v. *Lopez* (1961) 196 Cal.App.2d 651, 654 [16 Cal.Rptr. 728]; *People* v. *Carella* (1961) 191 Cal.App.2d 115, 129-130 [12 Cal.Rptr. 446]; *Arata* v. *Superior Court* (1957) 153 Cal.App.2d 767, 775-776 [315 P.2d 473]; *People* v. *Ames* (1957) 151 Cal.App.2d 714, 722 [312 P.2d 111]; but see: *People* v. *Lindogan* (1963) 212 Cal.App.2d 466, 470 [27 Cal.Rptr. 905].

[10]It is to be noted that defendant in his opening brief confines his attack on the legality of his arrest to the points mentioned by us, *supra*. The Attorney General in reply urges that we need not consider these points since there was reasonable cause to believe a felony had been committed, namely selling heroin. Defendant filed no closing brief rebutting the Attorney General's argument.

udicial and had the effect of denying him a fair trial.[11] The essence of defendant's complaint is this: Deputy Shaver first testified at the start of the trial that he arrested defendant for marked drug addiction. (Health & Saf. Code, § 11721.) Then upon recall by the prosecution Shaver testified at a later stage of the trial that he told defendant he was under arrest for sale of heroin. As we have set forth already, this latter testimony was introduced after the court permitted testimony from Hardman (outside the presence of the jury) to establish reasonable cause for an arrest without a warrant. We have already discussed these matters in detail and need not repeat them here. According to defendant, Shaver's testimony on recall was part of a "slipshod effort to justify appellant's arrest without a warrant."

However the record shows that Shaver upon being recalled testified to his arrest of defendant and his observation of needle marks on the latter. The prosecution then proposed to introduce statements made at the time by defendant to Shaver when defendant's counsel requested permission to examine Shaver on *voir dire*. Up to this point Shaver had made no mention of defendant's selling narcotics. The record shows that during the *voir dire* examination defense counsel (who was not defendant's present counsel on this appeal) elicited from Shaver the above testimony about a charge of selling heroin. At this point defendant's counsel already knew, at least from the testimony of Hardman outside the jury's presence, of defendant's selling heroin. When faced with the undesired testimony, said counsel made no motion to strike it. Indeed, on the contrary he seems to have pressed the inquiry with some persistence in an apparent attempt to show that the objectionable testimony had been contrived upon the suggestion of the prosecutor. At the bottom of all this was of course the fact that defendant was being tried for *possession* not *sale* of heroin and that the count charging him with a sale had been dismissed. (See fn. 1, *ante.*) Defendant emphasizes that this entanglement with an issue of sale is the root of the claimed prejudice.

However, as the record makes clear, it was defendant's counsel who first elicited from Shaver a reference to defendant's selling narcotics. To make matters worse, said counsel thereupon pursued the subject. The prosecution, on the other

[11]No direct claim is made that the prosecutor committed prejudicial misconduct or the court prejudicial error.

hand, had cautioned the witness not to refer to a sale of narcotics lest such reference be regarded as prejudicial to defendant. At the first opportunity at the conclusion of the *voir dire* examination by defendant, the prosecutor suggested that the reference be struck and the jury admonished to disregard it. Defendant's counsel made no effort to join in this suggestion. On recross-examination, defendant's counsel questioned Shaver not only about the circumstances of the arrest[12] but also as to whether the prosecutor had suggested to the witness that it would be more convenient to indicate that defendant had been arrested for a felony.

On further redirect-examination, the prosecutor sought to establish, as we think he was entitled to do under the circumstances, that he had not suggested to Shaver that it would be better to say that he had arrested defendant for selling narcotics. During this examination, the witness was asked why he had not booked defendant for sale of heroin and replied "The particular informant that made this purchase of heroin at the time we, or I discussed it with some of the other officers and we felt——," at which time defendant objected. At this point, defendant made a motion for a mistrial which, after extensive argument in chambers, was withdrawn. The court thereupon struck the answer quoted above and instructed the jury to disregard it.

As we have said, the foregoing developments were set in motion by defendant's counsel. We find neither misconduct on the part of the prosecutor nor error on the part of the court. We conclude that defendant's claim that the developments resulted in a denial of a fair trial has not been sustained by the record.

*The sufficiency of the evidence.*

As previously mentioned defendant was found guilty of possession of a narcotic (Health & Saf. Code, § 11500), receiving stolen property (Pen. Code, § 496) and possession of a weapon by a person convicted of a felony (Pen. Code, § 12021). He claims that none of these verdicts is supported by the evidence.

Defendant's argument in respect to the first offense noted above is confined to an assertion that there is no evidence of his dominion and control over the heroin found in the ivy

---

[12]The *first* question on recross-examination is worthy of note: "Q. [By defendant's counsel] First of all, it's your testimony that you told Mr. Estrada, 'You are under arrest for sale of heroin,' at the scene out there on Jackson & Alum Rock? A. That's right."

outside the building or discovered underground. It is urged that he did not have "exclusive custody" of these places, that a known addict was found in his apartment, and that many visitors had come there. The contention is without merit.

It is well settled that in a prosecution for unlawful possession of narcotics the People must prove (1) that the accused exercised dominion and control over the drug, (2) that he had knowledge of its presence and (3) that he had knowledge of its narcotic character. (*People* v. *Groom* (1964) 60 Cal.2d 694, 696 [36 Cal.Rptr. 327, 388 P.2d 359]; *People* v. *Redrick* (1961) 55 Cal.2d 282, 285 [10 Cal.Rptr. 823, 359 P.2d 255]; *People* v. *Winston* (1956) 46 Cal.2d 151, 158 [293 P.2d 40]; *People* v. *Gorg* (1955) 45 Cal.2d 776, 780 [291 P.2d 469]; *People* v. *Roberts* (1964) 228 Cal.App.2d 722, 726 [39 Cal.Rptr. 843]; *People* v. *Rosales* (1964) 226 Cal. App.2d 588, 591 [33 Cal.Rptr. 329]; *People* v. *Villanueva* (1963) 220 Cal.App.2d 443, 449-450 [33 Cal.Rptr. 811].)

These elements may be established by circumstantial evidence and any reasonable inferences drawn therefrom. (*People* v. *Groom, supra,* 60 Cal.2d 694, 696-697; *People* v. *Roberts, supra,* 228 Cal.App.2d 722, 726, and cases there cited; *People* v. *Rogers* (1962) 207 Cal.App.2d 261, 268 [24 Cal.Rptr. 341].) As the court said in *Rogers,* quoting from *People* v. *Hurst* (1960) 183 Cal.App.2d 379, 387 [6 Cal. Rptr. 483]: "The narcotics need not be found on the person of the defendant; it is sufficient if they are deposited in a place under the possession and control of the accused. Exclusive possession of the premises is not necessary nor is physical possession of the drug of the essence. (*People* v. *Robarge,* 151 Cal.App.2d 660, 668 [312 P.2d 70].)" (207 Cal.App.2d at p. 268; in accord: *People* v. *Roberts, supra,* 228 Cal.App.2d 722, 727.) However "proof of opportunity of access to a place where narcotics are found, without more, will not support a finding of unlawful possession." (*People* v. *Redrick, supra,* 55 Cal.2d at p. 285.)

In the instant case there was a residue of heroin in some used bindles among the trash in defendant's kitchen, a circumstance which defendant does not mention in his present argument. The apartment was defendant's. He was the only person who rented it and the bindles were thus in a place under his control. Unlike *People* v. *Antista* (1954) 129 Cal.App.2d 47 [276 P.2d 177] defendant had a previous connection with narcotics and on the day of his arrest had needle marks on his arms, indicating he was a user of nar-

cotics. The jury were therefore warranted in concluding that the bindles were in his possession and that he had knowledge of their presence, even though a known addict was found in the apartment at the time of the search. (*People* v. *Van Valkenburg* (1952) 111 Cal.App.2d 337, 340 [244 P.2d 750]; *People* v. *Elliott* (1960) 186 Cal.App.2d 178, 185 [8 Cal.Rptr. 795]; *People* v. *Villanueva, supra,* 220 Cal.App.2d 443, 450.)

Heroin was also found on the outside of the apartment house premises. A bag containing balloons with a total of 69 bindles of heroin was found in the ivy. Two feet away, was found the narcotic paraphernalia among which was a spoon with traces of heroin. We have already noted that the newspaper in which these articles were wrapped matched the newspaper in defendant's apartment. A subsequent search unearthed a jar containing heroin. As a tenant of the building, defendant had access to this area which was directly below his apartment.

As we have said access to the area in question without more, will not support a finding of possession. (*People* v. *Redrick, supra,* 55 Cal.2d 282, 285.) However there are other circumstances, some already noted, which warrant the inference of possession of the heroin and defendant's knowledge of its presence. Defendant, as we said, was connected with narcotics and had needle marks on his arms. ▮ Evidence supportive of the inference that he had attempted to obliterate the needle marks by burning them with a cigarette, establishes at once his connection with narcotics and his consciousness of guilt. It is inferable that the narcotic paraphernalia was his, further confirming his being a user. ▮ In addition, the finding of a toy balloon on his person, balloons in his kitchen and dining area, balloons on the night stand near his bed, and packages of balloons underneath the house, considered together with the other balloons and contraband, gives rise to a strong inference that defendant was knowingly in possession of the contraband. Although defendant does not seem to argue the point, all of the above evidence at the same time is susceptible of the inference that defendant was well aware of the narcotic character of the material involved.

We reject defendant's claims that the contraband found could have belonged to visitors or to the person found in his apartment at the time of the search as arguments more properly addressed to the trier of fact.

With respect to his conviction of the other two offenses, defendant advances bare assertions without any analysis of

the evidence. The offense of receiving stolen property, he says, requires knowledge of its stolen character; the offense of possession of a weapon by an ex-convict requires "actual dominion and control of the weapon by the felon." As with the heroin, so he argues, his connection with the guns does not rise above the level of pure guess and conjecture. ▆▆ The weapons had been buried near the balloons. A registration card for a Browning automatic, as well as the shovel with soil on it, had been found in the car used by defendant. He offers no analysis of this evidence. These facts considered with all of the other evidence pertinent to the heroin give rise to a permissible inference of possession. ▆▆ Guilty knowledge requisite to establish the offense of receiving stolen property can be inferred from circumstantial evidence. (*People* v. *Azevedo* (1963) 218 Cal.App.2d 483, 490-491 [32 Cal.Rptr. 748]; *People* v. *Scaggs* (1957) 153 Cal.App.2d 339, 352 [314 P.2d 793]; see *People* v. *Hartridge* (1955) 134 Cal. App.2d 659, 665 [286 P.2d 72]; *People* v. *Lodge* (1961) 190 Cal.App.2d 865, 872 [12 Cal.Rptr. 352].) ▆▆ As was said in *People* v. *Boinus* (1957) 153 Cal.App.2d 618, 622 [314 P.2d 787], "Possession of stolen property, accompanied by an unsatisfactory explanation of the possession or by suspicious circumstances, will justify an inference that the property was received with knowledge it had been stolen. [Citation.] It is enough if, considering all the evidence, which may be circumstantial, an inference of guilt may be found. [Citation.]" (In accord: *People* v. *Azevedo, supra,* 218 Cal.App.2d 483, 491; *People* v. *Barnes* (1962) 210 Cal.App.2d 740, 745 [26 Cal.Rptr. 793]; *People* v. *Lodge, supra,* 190 Cal.App.2d 865, 872; *People* v. *Malouf* (1955) 135 Cal.App.2d 697, 707 [287 P.2d 834]; *People* v. *Lopez* (1954) 126 Cal.App.2d 274, 278 [271 P.2d 874].) ▆▆ Here the fact that the weapons were concealed near the place where the contraband was concealed and the connection of the shovel with the method of concealment are suspicious circumstances supporting the inference of knowledge.

*Defendant's incriminating statements.*

Finally, defendant contends that the admission in evidence of incriminating statements made by him constitutes reversible error under the rule announced in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

Following the decision of the Supreme Court of the United States in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct.

1758, 12 L.Ed.2d 977], the Supreme Court of California held in *People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354, ''that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.''

Defendant directs our attention to four statements as the basis of his asserted error:

First: After Shaver arrested defendant he questioned him at the scene of the arrest about the needle marks on his arms. Defendant replied that he had no knowledge of any marks. Shortly thereafter, while the officers were waiting for defendant's car to be towed away, Hardman again went up to defendant who was then handcuffed. In response to defendant's inquiry as to ''what it was all about'' Hardman asked defendant if he had looked at his arms lately. Defendant replied ''I don't see anything'' and denied Hardman's suggestion that there were needle marks on his arms. The foregoing statements of defendant to the effect that he knew nothing about needle marks on his arms were introduced in evidence by the prosecution. In addition, the prosecution introduced the testimony of the two officers that there *were* needle marks on his arms as well as evidence, already noted by us, that defendant had attempted to burn away the incriminating marks and that when questioned at the sheriff's office defendant stated that he had burned his arms at work.

Second: After defendant was arrested and brought back to the vicinity of his apartment house, Sergeant Hardman obtained from defendant's personal effects the key to the apartment. He asked defendant if he shared the apartment with anyone to which defendant replied that he did not. Upon a further inquiry as to whether the officers who were about to enter, could ''expect to find anyone in there,'' defendant replied ''Only my housekeeper.''

Third: After defendant was brought to the sheriff's office, Deputy Shaver questioned him about narcotics. It was on this occasion that the deputy again questioned him about the marks on his arms which then appeared as burned areas. During the conversation on the subject of narcotics, defend-

ant asked: "If you had been, know so much about me or thought of me so much, how come you don't have a sale on me?"

■ Fourth: The prosecution called Dr. Nomof who examined defendant at the Santa Clara County Jail on the evening of April 23, 1963, for the avowed purpose of showing defendant's knowledge of the nature of heroin. In the course of giving the results of such examination including his physical findings the doctor testified that defendant had stated to him that he had used methedrine.[13] We deem it unnecessary to consider whether the *Dorado* conditions have been met or whether the rule is applicable to the incident cited, a matter upon which we express no opinion. In our view, the statement complained of is not incriminating and we find no prejudice to defendant resulting from its admission. We will not consider it further herein.

As to each of the first three statements, it appears that they were made after defendant's arrest and that the first two conditions of the *Dorado* rule are thereby satisfied. (*People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) ■ At no time does it appear that defendant was informed of his right to counsel or of his absolute right to remain silent or that he waived these rights. We cannot presume in the face of this record that the officers informed defendant of these rights. (*People* v. *Stewart, supra,* at p. 581.) The fourth condition of the rule has therefore been met.

■ Has the third condition been met? In respect to defendant's first statements concerning the needle marks we have some difficulty in determining from the record that it has been. It may have been the intent of Shaver when he questioned defendant immediately after the arrest, to get an incriminating statement connecting defendant with heroin. However, our analysis of the "total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and

---

[13]In pertinent part, Dr. Nomof testified: "'As I recall on this occasion, I asked the defendant whether he had used any heroin or other narcotics or other drugs. His statement to me as best I can recollect is that he had not used any heroin. He stated he had used methedrine on one or two occasions within the last, I think, one or two weeks. At the time of my examination, the general physical examination was not revealing. He appeared essentially normal, alert, rational. I could not state that he was under the influence of any drug at the time of my examination.'"

all other relevant circumstances'' (*People* v. *Stewart, supra,* 62 Cal.2d at p. 579) does not compel the conclusion that Shaver's or Hardman's questions lent themselves to eliciting incriminating statements. In fact, it seems that it was defendant who began the conversation with Hardman and that the ''interrogation'' was at that particular moment being conducted by defendant.

In respect to defendant's explanation about the burns on his arms, made at the sheriff's office in response to questioning, we have no doubt that the third condition has been met. The statements are obviously not a confession and their admission does not constitute reversible error. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356; *People* v. *Finn* (1965) 232 Cal.App.2d 422, 427-429 [42 Cal.Rptr. 704].)

Are they otherwise incriminating? Considered by themselves, they are an explanation that what the officers believed to be needle marks were in fact innocent burns. However, the prosecution introduced these statements together with other evidence to contradict them, thus impeaching defendant, showing that he did know about the needle marks, and attempted to conceal them. The statements were thus used to forge a link in the chain of circumstantial evidence showing defendant's consciousness of guilt. Defendant's statements were thus ''used against him at a criminal trial'' in violation of the rule announced in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490-491 as interpreted and developed in *People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354.

As to the second statements concerning the use of the apartment and the housekeeper, we do not believe that at the particular time, Sergeant Hardman was carrying on a process of interrogations. Hardman was about to use defendant's key to enter the apartment and execute the search warrant. As we read the record, he merely wanted to know who might be there. In our view the statements do not fall within the rule.

As to the third statement which was in fact a question by defendant (''how come you don't have a sale on me''), while this occurred during a process of interrogations as we have explained above and while the rule might apply to the question *for what it is worth,* we fail to see anything incriminating in it. In context, it seems to be more of a taunt or jibe hurled back at the inquisitor. We find no error in its admission.

Having determined that the admission of one of the first statements was error, and even assuming *arguendo* that the

admission of all of the first three groups of statements was error, nevertheless we have concluded that such errors were not prejudicial. There is substantial other evidence in the record as to the existence of the needle marks, the fact that defendant probably burnt these areas and the fact that defendant was the sole renter of the apartment. After an examination of the entire cause, including the evidence, it does not appear to us to be reasonably probable that a result more favorable to defendant would have been reached in the absence of the above errors. We cannot say that there has been a miscarriage of justice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant filed a separate notice of appeal in which he has appealed from the verdict [*sic*]. No appeal lies from a verdict and hence the attempted appeal therefrom must be dismissed. (*People* v. *Gotham* (1960) 185 Cal.App.2d 47, 50 [8 Cal.Rptr. 20] ; *People* v. *Goldstein* (1955) 136 Cal. App.2d 778, 793 [289 P.2d 581].)

The attempted appeal from the verdict or verdicts is dismissed. The judgment is affirmed.

Molinari, J., and Sims, J., concurred.

A petition for a rehearing was denied May 25, 1965, and appellant's petition for a hearing by the Supreme Court was denied June 30, 1965.