[Crim. No. 596.   Fourth Dist.   Feb. 10, 1949.]

THE PEOPLE, Respondent, v. LAURA MANDELL et al., Appellants.

David E. Peckinpah and Denver C. Peckinpah for Appellants.

Fred N. Howser, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendants were jointly charged with violations of section 11500 of the Health and Safety Code. In the first three counts they were charged with the possession of narcotics, the respective counts charging possession of morphine, opium and cocaine. In the fourth, fifth and sixth counts, respectively, they were charged with the transportation of these drugs.

On the last night in February, 1948, an officer was parked behind a garage in Mendota directly across the street from an auto court, consisting of 10 cabins. He was watching for a new Studebaker automobile with a certain license number. Shortly before 1 a.m. on March 1, he saw this car drive into this court and up to the door of cabin No. 8. This cabin was occupied by a man named Lanhan, who was known to the officer to be a user of narcotics. The officer ran over to this cabin. From the side of the cabin he saw the car parked at the front door, heard the car door slam and the front door of the cabin slam, and someone went inside the building. Through a window of the cabin the officer saw Lanhan and the man who had come from the Studebaker and heard Lanhan ask the man if he had any "snow," to which the man replied "Yes." After a further conversation in low tones which the officer could not hear, the other man walked to the door

of the cabin and the officer heard the door slam. The Studebaker was then driven out of the court, and headed north. This was some five minutes after it had entered the court. The officer ran to his own car and followed the Studebaker. At this time the defendant Mandell was driving the Studebaker and the defendant Hovermale sat beside her. About a mile and a half north of Mendota the Studebaker turned into a pumping station and stopped. The officer drove on for about half a mile, then turned off his lights, turned around and followed the Studebaker in the dark toward Mendota. At a point near the north edge of Mendota and when he was approximately 150 feet behind the Studebaker he suddenly turned his lights on high beam. He then saw a box come out of the Studebaker car from the passenger side of the front seat. He sounded his siren, both cars were stopped at the side of the road, and he arrested the defendants. He radioed for help and three other officers arrived about 30 minutes later.

When the other officers arrived the first officer told them that he had seen a box thrown out of the car a short distance back and that he could show them where this had occurred. He and one of the other officers walked back and found the box at the place where it had been thrown from the Studebaker. The box was a cigar box and was dry when found. The box contained four bindles of opium, four bindles of morphine, four bindles of cocaine and also five jars of opium. These were well packed in cotton and the outside of the box was securely taped on all four sides. The corners of some of the bindles were marked "C," and others were marked "H" or "M." These markings were indicative of the type of narcotics in the bindles. The cigar box contained $1,500 worth of narcotics at illegal market prices.

The officers learned from Mrs. Mandell that she lived at a certain address in Vallejo. As a result of this information police officers in Vallejo went to this address at about 5 o'clock that morning. They found a Mr. and Mrs. Silveira occupying the upstairs of the building and that Mrs. Mandell and her husband occupied the downstairs. They wakened Mr. Silveira and then entered the Mandell apartment and thoroughly searched it for narcotics, finding none. They made a cursory examination of the backyard behind this building, using flashlights. About two hours after the officers left, Mrs. Silveira found a closed can in some weeds next to the fence at the rear of this apartment. She called the officers, who

came and took the can. Inside this can was another can which was taped. This inner can contained a larger number of bindles of cocaine, opium and morphine and of a greater strength than those found in the cigar box. The bindles of cocaine and morphine in the can were marked "C" and "M," respectively, in a manner which was identical with those found on the bindles in the cigar box. A chemist testified as to the nature of the drugs found in both the can and the cigar box. A narcotic inspector testified that the bindles and jars involved in this case were similar to those customarily used but that this was the first time he had seen bindles which had been marked with letters as were those found in the box and the can. He also testified that the word "snow" is an underworld term for cocaine, particularly in powder form.

The defendant Hovermale did not take the stand. The defendant Mandell testified that Hovermale had been a visitor at their home in Vallejo for 10 days; that she and Hovermale left Vallejo at about 7:30 p.m. on the previous evening intending to go to Mendota and then to Bakersfield; that her husband was to meet her at Mendota and accompany them to Bakersfield; that before they left Vallejo her husband pointed out to her an old dark, noisy Buick automobile, telling her that he was going to Mendota in that car with another person and that she was to look for that car in Mendota; that her husband told her to meet him on the south side of the railroad tracks at Mendota between 12 and 1 o'clock but did not tell her the nature of his business in Mendota; that when she reached Mendota she turned into the first auto court because she had heard her husband say that he was going to an auto court; that in the auto court she looked for the old dark Buick and when she failed to see it, drove away; that neither she nor Hovermale had gotten out of her car at the auto court nor had entered cabin No. 8; that no one else had been in the Studebaker except Hovermale and herself; that during the period while they were stopped beside the road she saw the old dark Buick pass by three times; that she saw her husband and an unidentified person in this Buick but said nothing to the police about it; that she had never been in Mendota before; that she turned into the first place that looked like an auto court and just happened to turn to cabin No. 8; that no one had gotten out of her automobile; and that she was merely looking for her husband's car.

The jury found both defendants guilty on all six counts. Judgment was pronounced sentencing each defendant to im-

prisonment, it being further ordered, as to each, that the sentences on the first three counts run consecutively and that the sentences on the last three counts run concurrently with the respective sentences on the first three counts. Both defendants have appealed from the judgment thus entered.

■ The appellants first contend that the court erred in allowing the officer who had been watching the cabins and awaiting the arrival of the Studebaker car to testify regarding the conversation he overheard between Lanhan and a man in cabin No. 8. It is argued that this conversation was hearsay and not within any exception to the hearsay rule; that neither of the appellants was in the cabin at the time the conversation took place; that the conversation could not have been heard by the defendants who were in the automobile outside the cabin; and that this fully appears since the officer at the window was able to hear only a small part of this conversation. This officer testified that he heard Lanhan ask the man who came into the cabin if he had any "snow," to which that man replied: "Yes." He then testified that after that they talked in low tones of voice so that he was unable to hear what was said. Incidentally, it was argued to the jury that the man who actually entered the cabin and had this conversation with Lanhan was the husband of the appellant Mandell.

The contention here made is based upon appellants' version of a part of the evidence, disregarding other portions and the reasonable inferences therefrom. Whether or not the appellants could have heard this part of the conversation, if they were then in the car at the front door of the cabin, was a question of fact. Moreover, the evidence as a whole indicates that the conversation in question was one between Lanhan and Hovermale, and fully supports the inference and conclusion that Hovermale left the automobile and entered the cabin for the purpose of contacting Lanhan. Aside from the other evidence, the nature of the story told by the appellant Mandell, and her explanation of how she came to be in Mendota and to stop in front of cabin No. 8, could hardly fail to convince any jury that Hovermale was the man who entered the cabin.

■ It is next contended that the court erred in permitting the introduction in evidence of the can of narcotics found in the Mandell yard at Vallejo seven hours after the appellants were arrested in Mendota. The only contention made is that the evidence thus admitted was not sufficiently connected with the appellants.

This can of narcotics was found in some weeds in the yard of the Mandell home, where Hovermale had also been staying. They had left after dark on the preceding evening, and it was found early the next morning. A search of the home was made before daylight. While no narcotics were found in the home itself, this can of narcotics was found shortly after the officers left and at once reported to them. It contained the same kind of drugs as those found in appellants' possession at Mendota, although these were of somewhat greater strength. Moreover, the markings on the bindles in the can and those on the bindles in the cigar box were exactly similar and of a kind not usually found in such cases. The weight of this evidence was for the jury, but the evidence tending to connect this supply of narcotics with the appellants was entirely sufficient to justify its admission into evidence. It was perhaps unnecessary, since the other evidence was so conclusive, but no error appears.

██ Appellants' final contention is that the court erred in sentencing them on all of the six counts because all of the offenses charged were based upon a single transaction constituting but one offense, ''and thereby inflicting double punishment.'' It is argued that there was but one cigar box containing three different types of narcotics and that the only possession of the narcotics which was shown was that incident to the transportation. Under sections 11500 and 11001 of the Health and Safety Code the possession or transportation of either cocaine, opium or morphine is prohibited. The possession of each of these prohibited narcotics constitutes a separate criminal offense, which is also true of their transportation, and the fact that they were kept or carried in one package would make no difference. (*People* v. *Turco,* 104 Cal. App. 59 [285 P. 349] ; *People* v. *LeBaron,* 92 Cal.App. 550 [268 P. 651, 269 P. 476].) However, it has been held in this state, under similar circumstances, that where the only possession shown is that incident to the transportation, which is also forbidden, and it does not appear that there was a prior or subsequent possession, the possession and transportation may not be treated as two separate offenses. (*People* v. *Krupa,* 64 Cal.App.2d 592 [149 P.2d 416] ; *People* v. *Clemett,* 208 Cal. 142 [280 P. 681].) The only possession here shown was that which was incident to the transportation charged, the possession was a necessary part of the transportation and no prior or subsequent possession was shown or in any way appears. Under these circumstances, it must be held that the

evidence discloses three punishable offenses rather than six. The evidence is sufficient to sustain a conviction as to each appellant on three separate charges of possession or on three separate charges of transportation, but not of six separate offenses. While the court ordered the sentences to run concurrently in each instance with respect to the possession and the transportation, the sentences should have been confined to one or the other, in each instance.

The judgment is affirmed insofar as it relates to the first three counts, and reversed insofar as it applies to the last three counts.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied February 24, 1949, and appellants' and respondent's petitions for a hearing by the Supreme Court were denied March 10, 1949.