[Crim. No. 13364. Second Dist., Div. Five. July 22, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. DANIEL RAYMOND SCHROEDER, Defendant and Appellant.

W. F. Rylaarsdam, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Phillip G. Samovar, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J. pro tem.*—By information, defendant Daniel Raymond Schroeder was charged with illegal possession of opium and morphine derivatives (counts I through IX) in violation of section 11500 of the Health and Safety Code, with receiving stolen property (count X) in violation of section 496 of the Penal Code, and burglary (count XI) in violation of section 459 of the Penal Code. A jury found him not guilty of burglary (count XI), but guilty on each and every other count. Probation was denied and defendant was sentenced to the state penitentiary on counts V and X. Execution of sentence on count X was "stayed until final determination of sentence on count No. [V] when it will then be stayed permanently." No sentence was pronounced nor imposition thereof suspended on the counts other than V and X. Defendant appeals from the judgment.

### Contentions on Appeal

Defendant contends: (1) he cannot be guilty as a matter of law of either receiving stolen property (Pen. Code, § 496) or of illegal possession of narcotics (Health & Saf. Code, § 11500), because the narcotics and containers had been recovered by law enforcement authorities prior to his possession and control, if any; and (2) the evidence is insufficient to support the verdicts on the counts on which he was convicted.

---

*Assigned by the Chairman of the Judicial Council.

We also noticed that various units of narcotics of the same classification under the Health and Safety Code had been made the subjects of separate counts in the information. We requested counsel to file additional briefs as to whether this constituted error, and if so, whether it was prejudicial.

## Factual Background

Sometime during the night of August 25-26, 1966, the Gutierrez Drug Store, located in the Park Building, 635 State Street (corner of State and Ortega), in Santa Barbara was burglarized. Practically all of the narcotics in stock, plus tranquilizers, nembutal, and sleeping capsules, were stolen.

The Capri Restaurant, also located in the Park Building next to the Gutierrez Drug Store, likewise was burglarized and $30 to $40 taken. Holes large enough for a man to get through were found in the wall connecting with the Gutierrez Drug Store and in the ceiling connecting with the second floor of the building.

About 11:30 a.m. on September 15, 1966, Detective Joel Honey, of the Santa Barbara sheriff's office, received a phone call from a person, whose voice sounded like that of an adult male. The caller reported that he had been shooting, with his two sons, in the area of Bella Vista Road south of Romero Canyon Road, approximately 30 to 35 yards south of the fire-break road off of Bella Vista, when he came upon a wooden box under an oak tree. He thought it contained a ''bunch of dope.'' The box was not visible from the road. He gave directions to the location of the box. The caller declined to give his name, stating that he might have been violating the law by shooting in the area and that ''he didn't want to get involved in any testimony regarding 'dope'.''

Around 1 p.m. Detective Honey went to the location described. He found the wooden box behind an oak tree. It had a lid on it and was wired shut, with a stick through one of the wires. There was some debris on top. He lifted the lid and observed a yellow towel. Underneath the towel he observed many bottles appearing to contain drugs and narcotics. The name ''Gutierrez Drug Store,'' with address and telephone number, was on the tops of bottles containing pills. Detective Honey felt certain that the contents of the box were the loot taken in the Gutierrez burglary, which had occurred about three weeks before. He then closed the box, put some dirt and leaves on top of it, and returned to Santa Barbara, where he contacted Detective Sergeant George C. Evans, of

the Santa Barbara Police Department, in charge of vice and narcotic investigations.

The two officers picked up some photographic equipment and returned to the area of the box. To avoid detection, they proceeded to the location in Detective Honey's private Ford pickup truck and parked it around the bend in the road. Sergeant Evans took photographs of the area and of the box and contents, with the box lid open. Sergeant Evans had with him a list of items stolen in the Gutierrez Drug Store burglary. A visual check of the contents of the box against this list revealed a similarity of items. The two detectives then concealed themselves at separate points in proximity to the box and commenced a surveillance from around 3 p.m.

Defendant Schroeder, with a full beard, appeared on the scene around 5:15 p.m. He was standing next to the box with a shovel in his hand. Detective Honey knew him by name and sight. He had seen the defendant previously in June 1966 as the defendant was leaving room 207, located on the second floor of the Park Building, with a Carol Feiger, who was then renting room 207. He was wearing the full beard and dressed in Levi's, sandals, and a sport shirt or T-shirt, just as he was attired on September 15, 1966.

A Mrs. Jenny Perry was the tenant of room 207 of the Park Building on the night of the Gutierrez burglary. She was aroused from her sleep shortly after midnight when she saw a figure in her room near a window. She heard someone say, "Carol?" She replied, "No." The figure then remarked, "Oh, a friend of mine used to live here," and later, "It does look different." Although unable to perceive detailed features of the person silhouetted against the light coming from outside the window, she noted that the figure had a chopped-off, squarish beard.

Just prior to seeing defendant next to the box, Detective Honey had heard a car driving along Bella Vista Road and stop. Sergeant Evans heard somebody walk through the brush towards the box, return to the car, and again go towards the box. Detective Honey heard a car door open and then some voices.

One voice was the defendant's. It said, "Thank God." The other voice, which seemed to come from the direction of the vehicle asked, "Is it still there?" The voice was not that of the unknown caller on the telephone. Defendant replied, "Yeah, it's still here." The other voice said, "Good." Defendant then said, "I was worried. It looked like tracks

around here." Sounds of persons moving about were heard. Then the voice other than that of defendant asked, "Are you going to bury the stuff there?" Defendant replied, "I don't know." The other voice asked, "Is it too hard there?" Defendant replied, "I don't know." The other voice asked, "How about across the road?" Defendant replied, "No, this is good here." The other voice asked, "Does it look like it could be flooded out?" Defendant replied, "No, the water runs down over there. This is the place."

Then Detective Honey heard a car door shut. The vehicle sounded as if it were leaving the area, going towards Honey's pickup and Romero Canyon Road in the direction of Santa Barbara. Thirty seconds or so later, Honey heard the rapid blowing of a vehicle horn and the sound of an engine running in the distance.

At this juncture, the officers came out from their respective vantage points and identified themselves. Detective Honey placed the defendant under arrest for illegal possession of narcotics and for receiving stolen property. Honey then gave defendant the warning required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974].

In addition to the shovel which defendant was holding and the wooden box, the officers saw a green footlocker nearby. The box and its contents had been moved to the right of the oak tree, a distance of about 4 feet from where the officers had previously left it. Sergeant Evans had heard a sound that could have been made by the moving of the box. It appeared that defendant "was beginning to clear an area next to the oak tree" with the shovel. The green footlocker was about 6 feet away from him.

The photographs taken by Sergeant Evans, depicting the area, the box and its contents, and the green footlocker, were received in evidence.

Anthony Martin, owner of the Gutierrez Drug Store and a licensed pharmacist, identified Exhibits 1 through 12, which consisted of bottles and vials and their contents which had been removed from the wooden box. He based his identifications on cost codes he had placed on them and the fact that some of the containers were not of the type in which the store would dispense the drugs in its normal (retail) trade. He testified that around 200 bottles of drugs were taken in the burglary, including a quantity of small bottles containing amphetamines or sleeping capsules. In addition to Exhibits 1 through 12, there was a cardboard box containing many other

bottles which had also been removed from the wooden box.

John P. Thompson, an identification officer of the Santa Barbara sheriff's office, had dusted approximately 200 bottles from the wooden box. From two amber-colored bottles (Exhibits 8 and 12), *which were nearer the bottom of the wooden box,* he lifted a print corresponding to defendant's right thumb print from Exhibit 8 and a print identifiable as defendant's right middle fingerprint from Exhibit 12. Exhibit 8 had 26 points of comparison and Exhibit 12 had 17 points. Thompson's findings were confirmed by his supervisor, Lieutenant Edward K. Smith, of the Santa Barbara sheriff's identification office.

Dr. John Blanchard, a licensed physician, pathologist, and director of the Blanchard-Dickson Laboratory, to which Detective Honey had taken Exhibits 3 through 11 for examination and analysis, testified. For purposes of brevity the substance of his testimony is set out in tabular form below. He performed chemical tests on items marked "Yes" under the column headed "Chemical Analysis." On those marked "No," he did not, relying upon the fact that the government labels or stamps on those exhibits were unbroken. In the respective exhibits he found the respective narcotics in the respective quantities shown. Each narcotic exhibit was sufficient to produce a narcotic effect by the unit shown. The word "Merck" is a manufacturer's name. Hypodermic tablets are soluble. Narcotic solutions in ampoules are used for injections.

## TABLE

| Count of Information | Exhibit Number | Kind of Narcotic Contained | Quantity Contained | Chemical Analysis | Narcotic Effect |
|---|---|---|---|---|---|
| I | 11 | Opium Powder Merck | Enough for mild narcotic effect. | Yes | Yes, mild. |
| II | 3 | Ipecac & Opium | 1 oz. gross. | Yes | Yes, but ipecac causes vomiting. |
| III | 5 | Morphine & Atropine | 40 tablets ¼ gr. morphine sulfate; 1/150 gr. atropine sulfate. | No | Yes, each tablet. |
| IV | 10 | Morphine & Atropine | Pkg. of 20 c.c. ampoules, ea. ¼ gr. narcotic solution. | No | Yes, pkg. will. |

| Count of Information | Exhibit Number | Kind of Narcotic Contained | Quantity Contained | Chemical Analysis | Narcotic Effect |
|---|---|---|---|---|---|
| V | 8 | Morphine Sulfate (flakes) Merck | ⅓ oz. (tremendous amount) | Yes | Yes, on several people. |
| VI | 9 | Morphine Sulfate hypodermic tablets 1/6 gr. | ? vials, 20 tablets per vial. 8 tablets in opened vial. | Yes | Yes, exhibit will. |
| VII | 6 | Morphine Sulfate hypodermic tablets ¼ gr. | 40 tablets in unopened vial; 2 in opened vial. | Yes | Yes, each tablet. |
| VIII | 7 | Morphine & Atropine | 20 tablets, ea. contains ⅛ gr. morphine sulfate, 1/100 gr. atropine | Yes | Yes, 2 tablets will. |
| IX | 4 | Morphine Sulfate hypodermic tablets ½ gr. | 5 vials, ea. contains 20 tablets, ½ gr. morphine per tablet. | No | Yes, ea. tablet. |

The defendant did not take the witness stand.

His father, Raymond Daniel Schroeder, testified that the green footlocker did not belong to his son; that he had first seen it at the preliminary hearing. His son did not drive an automobile during September 1966, but he did see his son ride with a friend in the friend's car on occasions during that period.

### Defendant's Contentions Not Tenable

 ██ Relying upon *People* v. *Rojas* (1961) 55 Cal.2d 252 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252], defendant contends that as a matter of law he could be found guilty at most of attempts to receive stolen property (Pen. Code, § 496) and to possess narcotics illegally (Health & Saf. Code, § 11500), because he would not have been able to make away with the box and contents, which were under the surveillance of Detective Honey and Sergeant Evans. *Rojas* may be easily distinguished upon the facts. Here the evidence sustains a finding that defendant possessed the box and contents antecedent to their discovery by Detective Honey, knowing that the contents were narcotics. Defendant's fingerprints on the two bottles near the bottom of the box constitute circumstantial evidence that defendant had earlier handled these items. His oral expressions manifesting relief that the "stuff" was still there constitute proof that he had left the

articles at the location with the intent to later return for them.

The essential elements of receiving stolen property are: (1) The property must be stolen property, (2) the defendant must receive, conceal, or withhold it or aid in receiving, concealing or withholding it from its owner, (3) and defendant must have knowledge that the property is stolen property. (Pen. Code, § 496, subd. 1; *People* v. *Azevedo* (1963) 218 Cal.App.2d 483, 490 [32 Cal.Rptr. 748]; *People* v. *Lodge* (1961) 190 Cal.App.2d 865, 871 [12 Cal.Rptr. 352].)

No question arises as to the first two elements in this case. As to the third element, "Although guilty knowledge of the fact that the property was stolen is an essential fact to be proved in a prosecution for receiving stolen property, such knowledge need not be that actual and positive knowledge which is acquired from personal observation of the fact. [Citation.] It is not necessary that the defendant be told directly that the property was stolen. [Citation.] Knowledge may be circumstantial and deductive. [Citations.]" (*People* v. *Boinus* (1957) 153 Cal.App.2d 618, 621-622 [314 P.2d 787]; *accord, People* v. *Dunaway* (1963) 222 Cal.App.2d 322, 327 [35 Cal.Rptr. 154].)

It may be inferred from the evidence that the defendant was familiar with the Gutierrez Drug Store and its location. The large quantity of vials and bottles, around 200 in number, is itself notice that they could not have come through normal retail channels. Six dozen vials had the name and telephone number of the Gutierrez Drug Store on each vial. Nor does one bury lawfully obtained property in an area such as that described in this case. "Possession of stolen property, accompanied by an unsatisfactory explanation of the possession or by suspicious circumstances, will justify an inference that the property was received with knowledge it had been stolen. (*People* v. *Boinus,* 153 Cal.App. 2d 618, 622 [314 P.2d 787]; *People* v. *Bugg,* 204 Cal.App.2d 811, 817 [22 Cal.Rptr. 896]; *People* v. *Lyons,* 50 Cal.2d 245, 258 [324 P.2d 556].)" (*People* v. *Brumley* (1966) 242 Cal. App.2d 124, 127 [51 Cal.Rptr. 131].) Here, the possession was unexplained.

The inference of prior possession carries over to the counts charging illegal possession of narcotics. "Unlawful possession of narcotics is established by proof (1) that the accused exercised dominion and control over the contraband, (2) that he had knowledge of its presence, and (3)

that the accused had knowledge that the material was a narcotic. (*People* v. *Redrick*, 55 Cal.2d 282, 285 [10 Cal.Rptr. 823, 359 P.2d 255].) ▮ The foregoing elements may be established by circumstantial evidence and any reasonable inferences drawn from such evidence. (*People* v. *Jackson*, 198 Cal.App.2d 698, 704 [18 Cal.Rptr. 214].) And finally when the sufficiency of the evidence is challenged an appellate court must affirm if the record contains substantial evidence of all elements of the crime. (*People* v. *Contreras*, 211 Cal.App.2d 641, 646 [27 Cal.Rptr. 619].)'' (*People* v. *Groom* (1964) 60 Cal.2d 694, 696-697 [36 Cal.Rptr. 327, 388 P.2d 359].) The possession also can be constructive rather than actual. (See *People* v. *Showers* (1968) 68 Cal.2d 639 642-644 [68 Cal.Rptr. 459, 440 P.2d 939].) ▮ Exhibit 8, from which a print of defendant's finger was lifted, bore the label, ''Morphine Sulfate, Merck.'' Defendant's handling of this exhibit may be inferred. All of the items of contraband, which were the subjects of counts I through IX, had the word ''opium'' or ''morphine'' on them. ▮ These are words which even a lay person would understand to mean narcotics. (Cf. *People* v. *Pettyjohn* (1959) 172 Cal.App.2d 188, 197, 198 [342 P.2d 416].)

The pathologist, Dr. John Blanchard, testified that each exhibit contained narcotics in sufficient quantity to produce a narcotic effect on a person. The exhibit introduced on count V, on which defendant was sentenced, contained about one-third of an ounce of morphine sulfate, which the expert witness described as a tremendous amount, sufficient to produce a narcotic effect on several persons. He performed a chemical analysis on each exhibit, except those on which either the manufacturer's seal or the federal government stamp was unbroken.

▮ Under both federal[1] and state[2] laws manufacturers, packers, and distributors must label drugs containing a narcotic ingredient with the name and quantity of such narcotic substances. A bottle or vial indicating narcotic contents with seals unbroken is, as testified by the witness, prima facie evidence of the contents being as shown on the labels, since otherwise there would be a violation of either or both state and federal laws carrying criminal punishments. (*People* v. *Mintner* (1946) 73 Cal.App.2d Supp. 994 [167 P.2d 11]; cf.

[1] E.g., 21 U.S.C.A. § 352(d); §331(b), and § 333(a).
[2] E.g., Pen. Code, § 380; Bus. & Prof. Code, §§ 4171, 4181; Health & Saf. Code, §§ 25900, 25904, 26240-26245 incl., 26253, 26254, 26281-26285 incl., 26293 and 26295.

Health & Saf. Code, § 26296; *People* v. *Circus Room, Inc.* (1963) 213 Cal.App.2d 685, 688 [28 Cal.Rptr. 900].) No contravailing evidence was produced, although the burden of proof is on the party asserting a violation of a criminal statute. (Evid. Code, § 520.) It would have required only that quantum sufficient to raise a reasonable doubt as to whether the prima facie inference is true or not. In a criminal prosecution, a chemical analysis is preferable so as to minimize possible areas for doubt. However, absent evidence to the contrary, proof by this method was adequate to establish the narcotic contents of those containers on which the manufacturers' seals or government stamps were intact. The violations of section 11500 of the Health and Safety Code were thus adequately established.

### Illegal Splitting of Single Crimes

The record reflects a confusion between the proscription against imposing multiple punishments upon crimes arising from a single transaction and that against the proliferation of a single crime into more than one offense.

The jury returned guilty verdicts on counts I through X. The judgment reads in part: "The Court finds that the first nine counts charge but one act, Possession of narcotics. The defendant is therefore sentenced on not more than one, namely count No. 5. only. The sentence on Count No. 10, charges receipt of stolen property, and arises out of the same transaction as contained in count No. 5, but carrying the lesser penalty, and therefore, the sentence on count No. 10. is stayed until final termination of the sentence on count No. 5. when it will then be stayed permanently. (See *People* v. *Neil*) [*sic*]."

The record in other respects also evidences the trial court's intent to abide by the restrictions of section 654 of the Penal Code against multiple punishments for a single act, as construed by *In re Johnson* (1966) 65 Cal.2d 393, 395 [54 Cal. Rptr. 873, 420 P.2d 393], and *Neal* v. *State of California* (1960) 55 Cal.2d 11, 18, fn. 1 [9 Cal.Rptr. 607, 357 P.2d 839]. The judgment pronounced was more favorable to the defendant than required by section 654, in that a sentence could have been imposed on counts I or II as well as upon counts V and X. (*People* v. *Lockwood* (1967) 253 Cal.App.2d 75, 82-83 [61 Cal.Rptr. 131] (codeine and heroin); *People* v. *Lopez* (1959) 169 Cal.App.2d 344, 351 [337 P.2d 570] (heroin, marijuana, and amidone); *People* v. *Mandell* (1949) 90 Cal.App. 2d 93, 98-99 [202 P.2d 348] (cocaine, opium and morphine in

228

one cigar box). The stay of execution on count X falls short of the *Niles* formula (*People* v. *Niles* (1964) 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 11], approved in *In re Wright* (1967) 65 Cal.2d 650, 655-666, fn. 4 [56 Cal.Rptr. 110, 422 P.2d 998]), because it does not cover the contingency of the sentence on count V being terminated by reversal of that count on appeal. The errors were, however, favorable to the defendant.

 We have an additional problem in this case. We have instances of a single crime having been fragmented or proliferated into more than one offense, which may not be done. (*People* v. *Stephens* (1889) 79 Cal. 428, 430 [21 P. 856, 4 L.R.A. 845].) The general jurisprudential considerations are the same as those disfavoring imposition of multiple punishments upon crimes arising out of a single transaction (Pen. Code, § 654), but there is a technical difference between them. The issue here is "identity of offenses as distinguished from the identity of transactions from which they arise." (*People* v. *Venable* (1938) 25 Cal.App.2d 73, 74 [76 P.2d 523].) Under the foregoing cases of *Lockwood, Lopez*, and *Mandell*, possession of narcotics under different classifications of the Health and Safety Code may be charged and punished as separate crimes notwithstanding a simultaneous possession constituting but one transaction. The rationale of those cases does not hold where the narcotics are all of one kind.

The narcotics which are the subjects of counts I and II both fall into the category of "Opium and its derivatives and compounds . . . Raw, granulated, powdered, deodorized opium, tincture of opium, powdered or solid extracts of opium and opium preparations." (Health & Saf. Code, § 11001, subd. (a)1.) Those narcotics which are the subjects of counts III through IX all fall into the category of "Phenanthrene opium alkaloids, their salts, derivatives and compounds . . . morphine alkaloid, morphine salts, morphine compounds and preparations." (Health & Saf. Code, § 11001, subd. (b)1.) Possession of the narcotics charged under counts I and II would constitute a single offense and those under counts III through IX would constitute another separate single offense under section 11500 of the Health and Safety Code. (Cf. *People* v. *Smith* (1960) 185 Cal.App.2d 638, 640-641 [8 Cal.Rptr. 581]; *People* v. *Craig* (1941) 17 Cal.2d 453, 458-459 [110 P.2d 403]; *People* v. *Ryan* (1925) 74 Cal.App. 125, 131-132 [239 P. 149].)

If this doctrine was in the trial judge's mind in refraining

from imposing sentence on the narcotic counts other than count V, the more appropriate procedure would have been to consolidate the verdicts on counts I and II and on counts III through IX before imposing sentence, or imposing sentence on count I as well as on count V and striking counts II and III, IV, VI, VII, VIII and IX. However, the errors were not prejudicial.

The defendant could have reached these errors either by way of demurrer (Pen. Code, § 1004, subd. 3) or by a motion in arrest of judgment on the duplicitous counts (Pen. Code, § 1185). Defendant's failure to demur to pleading defects appearing on the face of the information constitutes a waiver. (Pen. Code, § 1012; cf. *People* v. *Snyder* (1940) 36 Cal.App. 2d 528, 532 [97 P.2d 976].) The failure of the court to arrest judgment in the absence of a defense motion (see Witkin, Cal. Criminal Procedure (1963) p. 596), did not result in prejudice to the defendant in this case because the court imposed sentence on only one narcotic count (count V). There having been no legal cause why the court could not have passed sentence within the time specified by section 1191 of the Penal Code on the other narcotic counts, subject to section 654 of the Penal Code, the mandatory new trial provision under section 1202 of the Penal Code comes into play on these other counts. Furthermore it is not reasonably probable that a result more favorable to the defendant would have been reached in the absence of the errors. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[3]

*Disposition*

In view of the sentence imposed on count V, which is the same offense as that of possessing the narcotics made the subject of counts II, III, IV, VI, VII, VIII, and IX, these counts are not subject to retrial and therefore may be stricken. (*People* v. *Smith* (1960) *supra,* 185 Cal.App.2d 638, 641.) The procedural posture of counts I and II renders disposition of those two counts upon this appeal both premature and unnecessary, especially in absence of request by the Attorney General that we pass upon the trial court's failure to effect a disposition of those counts (Pen. Code, § 1252; *People* v. *Ditson* (1962) 57 Cal.2d 415, 431 [20 Cal.Rptr. 165, 369 P.2d 714]).

---

[3]Where no federal constitutional error is involved, states may apply their own standard of harmless error. (*Cooper* v. *California* (1967) 386 U.S. 58, 62 [17 L.Ed.2d 730, 734, 87 S.Ct. 788].)

The judgment is modified by adding the words, "counts II, III, IV, VI, VII, VIII and IX are ordered stricken"; and as so modified, the judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 18, 1968.