Filed 11/8/21  Optional Capital v. DAS Corp. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| OPTIONAL CAPITAL, INC., | B301524 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC474472) |
| v. | |
| DAS CORPORATION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michelle Williams Court, Judge.  Reversed and remanded with directions.

LTL Attorneys, James M. Lee, Joedat H. Tuffaha, Prashanth Chennakesavan for Defendant and Appellant.

Rogari Law Firm, Ralph Rogari; Law Offices of Mary Lee, Mary Lee for Plaintiff and Appellant.

_____

This case involves two creditors' competing claims to stolen money.

In 2000, Kyung Joon Kim stole $14 million from DAS, a Korean corporation.

In 2001, Kim stole more than $15 million from Optional Capital, Inc., a corporation he controlled, spending heavily on luxury items and transferring money to several accounts.

One of those transfers included $12.6 million that Kim deposited in a Swiss bank account.

DAS sued Kim.

Optional sued Kim.

In 2010, DAS settled its lawsuit against Kim for $12.6 million and in 2011, with Kim's permission, withdrew that amount from Kim's Swiss account.

In 2013, Optional obtained a default judgment against Kim.

Finding Kim's Swiss account basically empty, Optional thereupon sued DAS for conversion, fraudulent transfer and receipt of stolen property, claiming DAS knew that the $12.6 million it withdrew from the account in 2011 belonged to Optional.

A jury largely rejected the claim. It found that DAS did not knowingly or intentionally take possession of Optional's funds, did not transfer property with the intent to defraud its creditors, and did not engage in conduct constituting malice, oppression or fraud.

The jury nevertheless found that DAS received funds that had been stolen from Optional, knowing the property to have been stolen. The trial court therefore entered judgment for Optional.

DAS appeals, contending the judgment was unsupported by substantial evidence because no evidence supported the jury's finding either that the $12.6 million belonged to Optional or that DAS knew that it did.

We conclude that no substantial evidence supported the finding that DAS knew the $12.6 million belonged to Optional. Accordingly, we reverse the judgment.

Optional cross-appeals, contending the trial court erred in excluding evidence of deposition testimony taken in a related forfeiture action and of the default judgment entered in that action. Optional also contends the judgment should be enhanced. We reject these contentions.

## BACKGROUND

### A. Misappropriations and Transfers

#### 1. Misappropriation from DAS

In 2000, Kyung Joon Kim and others controlled BBK Investment Advisors Co. Ltd., an investment fund with substantial investors, and MAF Fund, a related entity.

DAS, a Korean corporation that manufactures and distributes auto parts, invested approximately $19 million in BBK.

In 2001, DAS demanded that Kim return its invested amounts. Kim returned approximately $5 million, but then stopped responding to DAS's letters and calls demanding repayment of the remaining $14 million.

#### 2. Misappropriation from Optional

In April 2001, Kim and others purchased a little over 50 percent of New Vision Venture Capital Company Ltd., a defunct, insolvent Korean venture capital firm that later became known as Optional Capital, Inc.

3

Also in 2001, Kim falsified corporate charters for fictitious companies and opened bank and securities accounts in their names. He used New Vision/Optional to funnel funds acquired from others, transferring approximately $38.6 million from the falsified entities into Optional's accounts in exchange for corporate stock issued to himself.

Kim then deposited funds taken from Optional into his own bank accounts at United Commercial Bank in Rowland Heights, California.

### 3. Transfers to Alexandria Investments

In February 2002, Kim created Alexandria Investments, Inc. (Alexandria), a California corporation, and transferred money taken from Optional into Alexandria's United Commercial Bank account. Kim used some of the money to purchase expensive automobiles and real property in Beverly Hills, and ultimately transferred the remainder to Alexandria's Credit Suisse bank accounts in Geneva, Switzerland.

(We have greatly simplified the transactions hereby related, which spanned three continents and involved several individuals and entities, and dozens of accounts and transfers.)

## B. Four Prior Legal Actions Against Kim

### 1. Cooperation Agreement

In 2003, DAS and Optional began collaborating to determine the scope of Kim's misconduct and to trace the funds taken out of Optional, both coordinating with the FBI and the United States Attorney's Office for the Central District of California. Optional and DAS entered into a "Cooperative Prosecution Agreement" to identify and recover funds and divide any net recovery equally.

4

Optional terminated the cooperative prosecution agreement in 2004, after which DAS and Optional pursued their respective claims independently.

### 2. 2003 DAS's State Lawsuit Against Kim

In 2003, DAS sued Kim and his associates in Los Angeles Superior Court to recover $12.6 million it had invested. In August 2010, the court entered judgment in DAS's favor against two Kim entities for $31 million.

DAS and Kim then participated in a mediation with the Honorable John Zebrowski (Ret.) that resulted in a November 30, 2010 settlement agreement in which the Kim parties agreed to settle all of DAS's claims for 14 billion won, approximately $12.6 million at the then-current exchange rate.

### 3. 2004 Optional's Federal Lawsuit Against Kim

In 2004, Optional filed a lawsuit against the Kim parties and Alexandria in the United States District Court, seeking damages for fraud and conversion based on the looting of Optional (*Optional Capital, Inc. v. Kim* (C.D.Cal., Aug. 1, 2008, No. CV 04-3866 ABC (PLAx)) 2008 U.S.Dist. Lexis 71750). On February 4, 2008, the jury returned a verdict finding that the Kim parties and Alexandria converted approximately $15.5 million from Optional.

### 4. 2004 United States Forfeiture Proceedings

In 2004, the United States government commenced forfeiture proceedings against Kim and his associates in the United States District Court for the Central District of California and seized property, including Kim's automobiles and the Alexandria funds held at Credit Suisse in Switzerland. At a request of the United States government pursuant to the Mutual Legal Assistance Treaty (MLAT), the Swiss government froze the

5

Credit Suisse account. Both Optional and DAS filed claims to various assets in the forfeiture action, including to the monies in the Credit Suisse account.

In 2007, the court extinguished the United States government's forfeiture claim, leaving only Optional and DAS as claimants.

At some point thereafter, the Swiss government removed the freeze on the Credit Suisse account even though DAS and Optional were still prosecuting the forfeiture action.

On April 4, 2011, DAS withdrew its claims in the forfeiture proceeding pursuant to the November 30, 2010 settlement agreement in the state lawsuit.

On November 17, 2011, DAS was dismissed from the forfeiture action.

**5.     2007 DAS's Swiss Criminal Proceedings Against Kim**

By 2007, all funds at issue were located in the Credit Suisse account in Switzerland under the name of Alexandria Investment LLC, and had been frozen by order of the Canton of Geneva. In April 2007, DAS instituted criminal proceedings in Switzerland against Alexandria and a Kim associate, thereby obtaining a second freeze on the Credit Suisse funds.

In December 2010, the Swiss magistrate investigating DAS's criminal action learned about the November 30, 2010 state-lawsuit settlement agreement between DAS and Kim, and held a hearing on the matter.

**6.     February 1, 2011 Wire Transfer to DAS**

On February 1, 2011, the Prosecutor's Office for the Canton of Geneva lifted DAS's freeze on "the account held by ALEXANDRIA INVESTMENT LLC with Credit Suisse," and

ordered Credit Suisse to "immediately transfer the exchange value in US dollars of [14 billion Korean won] to the account of DAS Corporation at Korea Exchange Bank" in Korea. Credit Suisse complied with that order, and sent DAS a wire transfer in an amount equivalent to $12.6 million.

On April 4, 2011, DAS withdrew its claims in the United States forfeiture actions and dismissed the Swiss criminal action.

Optional demanded that DAS give Optional the funds it received from Switzerland, but DAS refused.

### 7. United States Forfeiture Proceedings: 2013 Default Judgment in Favor of Optional

In 2013 in the United States forfeiture proceedings, the Central District entered a default *in rem* judgment in Optional's favor, finding Optional possessed a constructive trust with respect to "All funds in Credit Suisse Private Banking Account No. 0251-844548-6 in the name of Alexandria Investment, LLC as of August 8, 2005."

In issuing its Findings of Fact and Conclusions of Law, the court expressly adopted a lower standard than it otherwise would have applied had DAS not been dismissed as a party to the Forfeiture Action. The court stated that "Optional's tracing burden is minimal," and noted that the standard would be different if there was a competing claim by another creditor.

The 2013 judgment directed that the funds in the Credit Suisse account be released to Optional, and the court retained jurisdiction to ensure compliance.

### C. Instant Lawsuit

Although by 2013 Optional had a default judgment against Kim and a constructive trust on Kim's Swiss account, DAS had removed $12.6 million from the account in 2011.

On December 1, 2011, Optional filed this action against DAS and Kim for that $12.6 million, alleging conversion, fraudulent transfer, and receipt of stolen property in violation of Penal Code section 496. (Optional and Kim ultimately settled, and Optional thereafter proceeded only against DAS.)

Optional alleged that commencing in July 2001, Kim converted Optional's property by transferring its funds to accounts at United Commercial Bank, and ultimately transferred over $15 million belonging to Optional to Alexandria's account at Credit Suisse. Optional asserted that its ownership of the funds derived from the fact that they originally came from its corporate accounts.

Optional alleged that beginning in 2008, DAS conspired with the Kim parties in "a concerted course of action designed to hinder, delay and prevent OPTIONAL from recovering the moneys defendants owed," converting $13 million belonging to Optional. It alleged that the fruit of this conspiracy was the 2011 settlement agreement between DAS and Kim, which led to DAS's withdrawal of $12.6 million from the Swiss account.

Optional alleged that DAS's receipt of $12.6 million from Alexandria's Swiss account pursuant to the order of the Prosecutor's Office for the Canton of Geneva constituted a fraudulent transfer.

Finally, Optional alleged that DAS received approximately $14 million from Alexandria "knowing those funds were stolen," which constituted a violation of subdivision (a) of Penal Code section 496. It sought treble damages pursuant to subdivision (c) of Penal Code section 496.

### 1. Four Res Judicata Proceedings

Optional claimed four times in two forums that the 2013 Central District default judgment, which granted it a constructive trust in "[a]ll funds" in Alexandria's Credit Suisse account "as of August 8, 2005," was res judicata as to ownership of the $12.6 million that DAS received from the account in 2011.

#### a. 2011 Central District

Optional first asserted this claim in a motion in the Central District in 2011, moving for a contempt order against DAS on the basis that by instituting criminal proceedings in Switzerland and obtaining funds from the Credit Suisse account, DAS bypassed the Central District's *in rem* jurisdiction over the account. The court disagreed. Although it found DAS's conduct to be "troubling," and acknowledged that transfer of the Credit Suisse funds to DAS "diminish[ed] the value of the res," rendering any future decision by the court on Optional's competing claim "a merely academic exercise," the court found that DAS had violated no express court order.

#### b. First Assertion in the Instant Action

Optional next asserted its res judicata claim in this action, moving for summary judgment against DAS on the ground that the 2013 default judgment established DAS's ownership interest in the $12.6 million. The superior court denied the motion on the ground that "at the time the [2013] judgment was entered, DAS was not a party to the forfeiture action" and was not "in privity with any party."

#### c. 2018 Central District

In 2018, Optional again asserted its res judicata claim before the Central District, moving for a contempt order against DAS on the basis that DAS violated the 2013 judgment by failing

to turn over the $12.6 million to Optional. The Central District again denied the motion, finding Optional failed to show that DAS violated the 2013 judgment because that judgment "simply stated the Credit Suisse account belonged to Optional and should be turned over to Optional. Optional's proposed interpretation of the judgment, arguing it required DAS to return the funds it received from the Credit Suisse account in 2011, requires a tortured reading." In 2019, Optional moved for reconsideration of this ruling, which the Central District court denied.

### d. Second Assertion in the Instant Action

Finally, Optional again asserted its res judicata claim in the instant action in opposition to DAS's motion for judgment on the pleadings. The trial court found it could not "be determined that DAS's interest in the [2013] default judgment was in privity with any defendant at the time of entry of the judgment" because DAS "obtained funds from the Swiss account[] on February 1, 2011, over two years prior to the judgment[,] and DAS was dismissed from the forfeiture action [on] November 17, 2011."

### 2. Motions in Limine

Before trial, Optional sought permission to introduce as evidence: (1) its judgment in the 2004 state action against Kim and a lien it had obtained in connection with that action; and (2) the 2013 forfeiture default judgment.

The trial court excluded the 2013 judgment, finding "there is no res judicata effect of [the] judgment," which "was entered two years after the alleged wrong act by DAS in this case."

The court admitted the state judgment for a limited purpose: The jury was "to consider [the] document only as between the rights between Optional Capital on one side and [the

10

Kim parties], and not concerning DAS Corporation. And this judgment is only as of February 7, 2011."

The court excluded evidence of any lien.

### 3. Trial

It was undisputed at trial that Kim had misappropriated funds from both DAS and Optional, and that DAS received $12.6 million from Alexandria's Credit Suisse account. The only pertinent issue on appeal is whether DAS knew that the $12.6 million belonged to Optional.

Optional called Hwan Ook Yang, a stockbroker with degrees in economics and international finance who joined Optional in 2004. He testified that Kim misappropriated approximately $33 million from Optional's accounts, transferred the funds to several of his own accounts, and used the funds to purchase a home in Beverly Hills and several cars. Ultimately, Kim transferred funds to Alexandria's account in Rowland Heights, and from there to Alexandria's Credit Suisse account in Geneva.

Both parties called Jason Engel, an accountant retained by DAS in 2006 to conduct a tracing. Engel testified that neither he nor Yang knew for certain the origin of any particular funds originally deposited into Optional's accounts. However, Engle had been able to trace the Credit Suisse funds back to an investment DAS had made into BBK.

Like Yang, Engle testified that Kim withdrew millions of dollars from Optional's accounts and transferred them to accounts he controlled, including a March 16, 2002 transfer to Alexandria's Rowland Heights account in the amount of $18,493,825, and from there a transfer to Alexandria's Credit Suisse account in the amount of $14.6 million.

11

4. **Special Verdict**

The jury was given a special verdict form covering Optional's three causes of action for conversion, fraud, and receipt of stolen property.

a. Conversion

With respect to Optional's conversion claim, the jury found that DAS did not "substantially interfere with [Optional's] property by knowingly or intentionally taking possession of the funds."

b. Fraudulent Transfer

With respect to Optional's fraudulent transfer claim, the jury found that Alexandria did not "transfer property with the intent to hinder, delay, or defraud one or more of its creditors."

c. Receipt of Stolen Property

With respect to Optional's claim for receipt of stolen property in violation of Penal Code section 496, the special verdict form asked four questions:

"14. Did DAS CORPORATION buy or receive funds from Alexandria Investments LLC that had been stolen or that had been obtained in any manner constituting theft or extortion from OPTIONAL CAPITAL knowing the property to be so stolen or obtained?

"____YES ____ NO

"Please answer question 15."

The jury answered YES.

"15. Did DAS CORPORATION conceal, sell, withhold, or aid in concealing, selling, or withholding the funds from OPTIONAL CAPITAL knowing the property to be so stolen or obtained?

"____ YES ____ NO"

The jury answered NO.

"If your answer to question 14 *or* question 15 is YES, then answer question 16."  (Italics added.)

"If you answered NO to question 14 and question 15, please proceed to SECTION 4."

The jury answered NO.

"16.  Was OPTIONAL CAPITAL, INC. harmed?

"____ YES     ____ NO"

The jury answered YES.

"17.  Did [Optional] file this lawsuit within 3 years after [DAS] bought or received funds from [Alexandria] that had been stolen or that had been obtained in any manner constituting theft . . . from [Optional] knowing the property to be so stolen or obtained or within 3 years after [Das] . . . withheld . . . the funds from [Optional] knowing the property to be so stolen or obtained?

"____ YES   ____ NO"

The jury answered YES.

Section 4 of the special verdict form asked in question 18 what damages Optional suffered.

The jury answered "$2 million."

Section 5, titled "Punitive Damages," asked in question 19 whether DAS engaged in conduct constituting malice, oppression or fraud.

The jury answered NO.

**5.     Judgment and Post-Judgment Proceedings**

The trial court entered judgment for Optional in the amount of $2 million.

DAS filed a motion to enter judgment notwithstanding the verdict (JNOV) or alternatively to set aside the verdict, arguing that liability for receipt of stolen property was not supported by

substantial evidence. The trial court denied the motion, concluding without elaboration that "[a]fter reviewing the record, the court finds there is substantial evidence to support the jury's verdict."

DAS also moved for a new trial on the ground of attorney misconduct. The court denied the motion, finding DAS failed to show any misconduct.

Optional moved to modify or vacate the damages portion of the judgment and enter judgment in its favor for $12 million, or in the alternative to treble the $2 million judgment. The court concluded, without elaboration, that "there is substantial evidence to support the jury's findings concerning damages," and denied the motion.

DAS appeals and Optional cross-appeals.

## DISCUSSION

### I. DAS'S APPEAL

DAS contends that no substantial evidence established that Optional owned the $12.6 million or that DAS knew the funds were stolen. Accordingly, DAS argues, the trial court erred in denying its JNOV motion. We conclude that no substantial evidence supports the jury's finding that DAS knew the Swiss funds belonged to Optional.

#### A. Judgment on a Special Verdict

Subdivision (a) of Penal Code section 496, provides in pertinent part: "Every person who . . . receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, . . . shall be punished by imprisonment in a state prison, or in a county jail for not more than one year."

14

"Thus, to sustain a conviction for receiving stolen property, the prosecution must prove (1) the property was stolen; (2) the defendant knew the property was stolen; and (3) the defendant had possession of the stolen property." (*People v. Land* (1994) 30 Cal.App.4th 220, 223.) Knowledge that property was stolen may be inferred from circumstantial evidence. (*People v. Schroeder* (1968) 264 Cal.App.2d 217.)

Subdivision (c) of Penal Code section 496 provides that [a]ny person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of actual damages . . . ."

Here, by answering the special verdict form's Question 14 in the affirmative, the jury found that DAS (1) received funds stolen from Optional, (2) knowing them to have been stolen. The question is whether substantial evidence supported both findings.

**B.     Sufficiency of the Evidence**

A trial court must grant a JNOV motion if there "is no substantial evidence in support" of the verdict. (*Sweatman v. Department of Veterans Affair* (2001) 25 Cal.4th 62, 68.)

When a plaintiff's verdict is challenged for lack of substantial evidence, we must determine whether there is evidence that is " ' "reasonable in nature, credible, and of solid value; [constituting] 'substantial' proof of the essentials which the law requires in a particular case." ' " (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.) To do so, we first resolve all explicit conflicts in the evidence and presume all reasonable inferences in favor of the verdict. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632.) We then determine whether evidence supporting the verdict is substantial. "[T]his does not mean we must blindly seize any

15

evidence in support of the respondent in order to affirm the judgment. The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review.' [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' " (*Id.* at p. 1633.) "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the whole record. [Citation.] While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." (*Ibid.*)

Where a verdict is supported only by inferences that are contrary to "clear, positive, uncontradicted . . . [evidence] of such a nature that it cannot rationally be disbelieved," the inferences do not constitute substantial evidence supporting the verdict. (*Teich v. General Mills, Inc*. (1959) 170 Cal.App.2d 791, 799.)

Here, the jury's verdict is founded on a crucial inference for which there was no evidentiary support and which was contravened by clear, positive, uncontradicted evidence: That DAS knew that the funds in the Swiss account belonged to Optional.

To the contrary, however, Engel testified, and it was undisputed, that Kim used his control of Optional to misappropriate millions of dollars from both Optional and DAS. This fraud against DAS as well as Optional was undisputed when

16

the parties entered into a cooperative prosecution agreement in 2003, and was well corroborated at trial.

No evidence suggested that the money Kim deposited in Optional's accounts belonged solely to Optional.

Although Yang traced funds *from* Optional's accounts, finally locating them in Switzerland, he did nothing to establish the original ownership of those funds. Only Engel testified that funds in the Credit Suisse account could be traced to any owner, and that was to DAS.

That the funds were at one point held in Optional's account did not establish that they belonged to Optional. If ownership of an account equated to ownership of funds in the account, Optional would have no claim against Alexandria's Swiss account.

There was therefore no evidence that DAS knew that all the funds in Alexandria's Swiss account belonged to Optional, and concomitantly no evidence that DAS knew the funds it received from Credit Suisse were stolen.

The trial court therefore should have granted DAS's motion for JNOV.

Optional argues that the 2013 federal forfeiture judgment established as a matter of law that all the Credit Suisse funds belonged to Optional, and the trial court's erroneous exclusion of evidence of that judgment precluded Optional from proving DAS knew the Credit Suisse funds were stolen. We disagree.

### 1. Res Judicata

The doctrine of res judicata operates to bar multiple litigation "arising out of the same subject matter of a prior action as between the same parties or parties in privity with them." (*Gates v. Superior Court* (1986) 178 Cal.App.3d 301, 308; see also

*Frommhagen v. Board of Supervisors* (1987) 197 Cal.App.3d 1292, 1299.)

The doctrine has two effects. "First, where the causes of action and the parties are the same, a prior judgment is a complete bar in the second action. This is fundamental and is everywhere conceded." (*Sutphin v. Speik* (1940) 15 Cal.2d 195, 201.)

It is well established that such a judgment is binding not only as to a claim actually raised but also as to those matters that might have been raised in support of the claim actually raised. (E.g., *Price v. Sixth Dist. Agricultural Ass'n* (1927) 201 Cal. 502, 511; *Pacific Mut. Life Ins. Co. of Cal. v. McConnell* (1955) 44 Cal.2d 715, 724-725; *Amin v. Khazindar* (2003) 112 Cal.App.4th 582, 590.) "In other words, when an issue has been litigated all inquiry respecting the same is foreclosed, not only as to matters heard but also as to matters that could have been heard in support of or in opposition thereto." (*Price*, at p. 511.) "If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged. The reason for this is manifest. A party cannot by negligence or design withhold issues and litigate them in consecutive actions. Hence the rule is that the prior judgment is *res judicata* on matters which were raised or could have been raised, on matters litigated or litigable." (*Sutphin v. Speik*, *supra*, 15 Cal.2d at p. 202.)

Here, it is undisputed that DAS was neither a party nor in privity with a party to the 2013 judgment, and the causes of

action litigated in the federal forfeiture proceedings were not the same as the Penal Code section 496 cause of action litigated here.

## 2. Collateral Estoppel

"In its secondary aspect res judicata has a limited application to a second suit between the same parties, though based on a different cause of action. The prior judgment is not a complete bar, but it 'operates as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action.' (*Todhunter v. Smith* [(1934)] 219 Cal. 690, 695 [28 P.2d 916].) This aspect of the doctrine of res judicata, now commonly referred to as the doctrine of collateral estoppel, is confined to issues actually litigated." (*Clark v. Lesher* (1956) 46 Cal.2d 874, 880; see also *Sutphin v. Speik*, *supra*, 15 Cal.2d at pp. 201-202.)

"First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) This means that "the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." (*Clemmer v. Hartford Insurance Co*. (1978) 22 Cal.3d 865, 875.)

Collateral estoppel does not apply when "the factual finding in the prior proceeding was arrived at based on a lower standard of proof than the one required in the subsequent proceeding."

(*The Grubb Co., Inc. v. Department of Real Estate* (2011) 194
Cal.App.4th 1494, 1503.)

Again, by 2013, DAS was neither party to nor in privity
with a party to the forfeiture proceedings. Moreover, the federal
court lowered the burden of proof in those proceedings (which
after DAS's departure amounted to no more than a prove up) to a
"minimal" standard that it expressly stated would have been
higher had there been any competing creditor. Therefore,
collateral estoppel does not apply.

Further, the specific issue that Optional seeks to preclude—
—that it, and not DAS, was the exclusive owner of the $12.6
million—was never adjudicated in the forfeiture action.

Although in 2013 the Central District found that Optional
possessed a constructive trust as to "[a]ll funds in Credit Suisse
[account] as of August 8, 2005," the court had earlier, in 2011,
acknowledged that the $12.6 million transfer to DAS
"diminish[ed] the value of the *res*," rendering any future decision
by the court on the competing claims case "a merely academic
exercise."

A fair reading of the 2013 judgment is that
notwithstanding the court's reference to funds in the Swiss
account "as of" 2005, the judgment included only funds currently
in the account, i.e., as of 2013. Had the court intended the *res* to
include the $12.6 million DAS withdrew in 2011 it would have
said so. It said the opposite, that the $12.6 million transfer to
DAS diminished the *res*.

### 3. Conclusion

Even if the 2013 default judgment established that
Optional owned the $12.6 million DAS withdrew from
Alexandria's Swiss account in 2011, it would not establish that

20

DAS knew two years before the judgment that the funds belonged Optional.

### C. Exclusion of Other Evidence

#### 1. 2013 Judgment

Optional argues the trial court erred in refusing to admit the 2013 judgment as prima facie (as opposed to conclusive) evidence that Optional owned all the Credit Suisse funds. We disagree.

Absent a statutory exception, relevant evidence is admissible. Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action. (Evid. Code, § 210.) Nevertheless, relevant evidence should be excluded if the trial court, "in its discretion[, determines that] its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] . . . [I]ts exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Here, Optional's theory of the case was that all the funds in all the accounts that were eventually funneled into the Credit Suisse account belonged exclusively to Optional. The 2013 judgment was only minimally probative on this issue. As we and

21

two trial courts concluded, the 2013 judgment tended to show only that Optional owned funds remaining in the Swiss account as of 2013, more than a year after DAS withdrew the $12.6 million at issue.

On the other hand, the 2013 judgment had great potential to sew confusion with the jury because it constituted a federal court proclamation that Optional possessed a "constructive trust" in the Credit Suisse funds "as of" 2005," which to a lay person would suggest (and Optional insists) reaches beyond the parties and issues before the forfeiture court, into the instant proceedings. Optional attempted several times to make this very argument at trial even without the 2013 judgment, requiring DAS to make repeated objections that were all sustained.

Given the minimal probative value of the 2013 judgment and the great risk it would confuse the jury, we conclude its probative value was substantially outweighed by the risk of jury confusion. Accordingly, the trial court acted within its discretion in shielding the jury from the fine points of res judicata law by excluding the 2013 judgment.

### 2. Deposition Testimony from Other Cases

The trial court excluded deposition testimony taken in the forfeiture action from Jin Young Lee and Sung Woo Kim concerning various aspects of Optional's operations and DAS's investment into BBK, reasoning that the testimony was hearsay to which no exception applied.

Specifically at issue was the hearsay exception found in Evidence Code section 1291, subdivision (a)(2), which excepts former testimony from the hearsay rule if "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right

22

and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).) The court concluded the exception did not apply because DAS did not have a similar interest in the forfeiture action to its interest here.

Optional argues the trial court erred, and in doing so made it "more difficult for Optional to re-try a case it had already won." We disagree.

In the forfeiture action DAS and Optional were for a time cooperating co-claimants, even sharing legal representation and jointly seeking to recover funds that Kim stole from them.

Here, DAS and Optional are adversaries.

DAS therefore had no opportunity or right in the cooperative forfeiture action to cross-examine Lee and Sung Woo Kim with an interest and motive similar to that which it possesses in these adversarial proceedings.

Moreover, Optional offers no explanation how Lee's or Sun Woo Kim's deposition testimony would have assisted it at trial other than to establish that Optional prevailed in the forfeiture action, which as discussed above is undisputed and immaterial.

### D. DAS's Further Arguments

DAS further contends that: (1) By answering "no" to Question 15 the jury found that DAS did not know the Credit Suisse funds were stolen; (2) Penal Code section 496 does not apply to money; (3) Penal Code section 496 does not apply when the property is received from a state actor; (4) Penal Code section 496 does not apply to out-of-state conduct; (5) all alleged wrongdoing constituted protected petitioning activity; and (6) Optional's trial counsel committed prejudicial misconduct.

23

Given the above discussion and conclusion, we need not address these contentions.

## II.    OPTIONAL'S APPEAL

In its appeal, Optional contends (1) treble damages are mandatory under Penal Code section 496; (2) the 2013 judgment is entitled to preclusive res judicata effect; (3) the trial court erred in excluding the 2013 judgment for other than res judicata purposes and for excluding the testimony taken in the forfeiture proceeding of Lee and Sung Woo Kim; (4) the damages award should be increased to $12.6 million, and then trebled; and (5) any proceedings on remand should include a new trial on the issue of constructive fraud.

For reasons given in our resolution of DAS's appeal, we reject these contentions.

## DISPOSITION

The judgment is reversed and the matter remanded with directions to enter a new judgment for DAS.  DAS is to recover its costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

24